UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LAWRENCE JACOBS, JR.                                    CIVIL ACTION

VERSUS                                                          NO. 15-1334

N. BURL CAIN                                               SECTION "R" (2)

## ORDER AND REASONS

Lawrence Jacobs, Jr.'s petition for writ of habeas corpus under 28 U.S.C. § 2254 was referred to Magistrate Judge Donna Currault for a Report and Recommendation ("R&R").  Magistrate Judge Currault recommends that the petition be denied and dismissed with prejudice.[1]  Jacobs objects to the R&R.[2]  The Court has reviewed the petition, the record, the applicable law, the Magistrate Judge's R&R, and Jacobs' objections.  For the following reasons, the Court overrules the objections, and dismisses the petition with prejudice.

## I.   BACKGROUND

### A.   State Courts

Jacobs was first charged by a Jefferson Parish grand jury in a two-count indictment for the first degree murders of Nelson and Della Beaugh in

---

[1]     R. Doc. 43.
[2]     R. Doc. 48.

1996.  *State v. Jacobs*, 789 So. 2d 1280, 1282 (La. 2001) (per curiam) [hereinafter Jacobs I].  Jacobs was tried separately by jury in 1998.[3]  Before Jacobs' first trial, the indictment was amended by hand to reflect one count of first degree murder of both victims.[4]  At the trial, the court admitted a custodial statement made by Jacobs to a Lieutenant Snow-Pernia in November 1996, over Jacobs' objection that he had not knowingly, intelligently, or voluntarily waived his right to remain silent.[5]  After the trial, Jacobs was convicted and sentenced to death.  *Id.* at 1282.  On direct appeal, the Louisiana Supreme Court reversed Jacobs' conviction and sentence and remanded the matter for a new trial, finding that the trial court had erred in denying the defense's challenge for cause to two jurors based on views they expressed concerning the death penalty during voir dire.  *Id.* at 1288.

In 1999, the State of Louisiana amended its statutory structure on the selection of grand juries in an attempt to eliminate racial discrimination in that process.[6]  Jacobs was re-indicted through the amended grand jury process in 2002 in a one count indictment for the first degree murder of both victims.  *State v. Jacobs*, 13 So. 3d 677, 681 (La. App. 5 Cir. 2009).  After his

---

[3]   R. Doc. 43 at 3.

[4]   *Id.*

[5]   R. Doc. 25 at 48-49.

[6]   R. Doc. 43 at 4; *see also State v. Langley*, 813 So. 2d 356, 359 n.2 (La. 2002) (discussing amendment and its history).

re-indictment, Jacobs filed a renewed motion to suppress his custodial statement to Lieutenant Snow-Pernia, which the trial court denied after argument from the parties and an evidentiary hearing.[7]  The Louisiana Fifth Circuit upheld this decision, and a recording of the statement was played at trial without objection.[8]

Before Jacobs' second trial, the state trial court held a hearing in September 2004 on a motion filed by the State to traverse or, in the alternative, disqualify Jacobs' capital defense attorney, G. Ben Cohen.[9]  The State argued that Cohen was not qualified to represent Jacobs under Louisiana Supreme Court Rule XXXI and the Louisiana Indigent Defendant Assistance Board's ("LIDAB") Indigent Defense Standards, Ch. 7, Part III, Std. 7-3.1, setting forth standards applicable to indigent defense counsel in capital trials.[10]  The trial court granted the motion and disqualified Cohen.[11]  Also before trial, at a hearing held to discuss multiple pretrial motions, the State amended the indictment to reflect two counts of second degree murder, and memorialized that amendment by hand on the 1996 indictment rather

---

[7]     R. Doc. 43 at 78.
[8]     *Id.* at 78-79.
[9]     St. R. Vol. 54 at 13610.
[10]    *Id.*
[11]    *Id.* at 13628.

than the 2002 indictment.[12]   *Jacobs*, 13 So. 3d at 681-82.   Jacobs was

arraigned on the amended indictment and pleaded not guilty on August 17,

2006.  *Id.* at 682.

Jacobs' second jury trial began in 2006.   *Id.*   During voir dire,

defendant alleged that the State had used peremptory strikes in a racially

discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79

(1986), with respect to seven prospective jurors: Eric Hughes, Leola

Florence, Melanie Auzenne, Ivory Jordan, Virgie Stevenson, Viola Hawkins,

and Tempy Dillon. [13]  In his *Batson* challenge, Jacobs attempted to introduce

into evidence a report, known as the "Black Strikes report,"[14] that was drafted

in 2003 by the Louisiana Crisis Assistance Center and purported to identify

a statistical trend on the part of the Jefferson Parish District Attorney's Office

to strike prospective Black jurors at a disproportional rate to white

prospective jurors over the course of 390 jury trials.  The trial judge excluded

this evidence after hearing arguments from the defense and the State

---

[12]   R. Doc. 43 at 5.

[13]   St. R. Vol. 50 at 12619, 12758.

[14]   Richard Bourke, Joe Hingston, and Joel Devine, *Black Strikes: A Study of the Racially Disparate Use of Peremptory Challenges by the Jefferson Parish District Attorney's Office*, Louisiana Crisis Assistance Center (Sept. 2003), available at https://capitalpunishmentincontext.org/files/resources/race/BlackStrikes.pdf [hereinafter Black Strikes Report].

regarding its admissibility.[15]  At the conclusion of his second trial, Jacobs was convicted of two counts of second degree murder by a unanimous jury composed of eleven white jurors and one Black juror.  *Jacobs*, 13 So. 3d at 682, 688.   Jacobs was sentenced to two consecutive terms of life imprisonment without the possibility of parole.[16]

Jacobs asserted sixteen assignments of error on direct appeal to the Louisiana Fifth Circuit Court of Appeals.  The Louisiana Fifth Circuit declined to consider all but Jacobs' *Batson* claim.  It concluded that the State had violated *Batson* by striking jurors Florence and Hughes on account of race.  *Id.* at 691.  The Court vacated Jacobs' convictions and sentence and remanded to the trial court for further proceedings.  *Id.*  While the court did not expressly find discriminatory intent behind any other strikes, it did express concern about the trial court's failure to make explicit findings on the record regarding the plausibility of the State's proffered race-neutral explanations for jurors Auzenne, Jordan, and Stevenson.  *Id.* at 692-95.

The Louisiana Supreme Court reversed the court of appeals, finding that the court's standard in assessing the trial judge's conduct was too strict and that the trial court had properly accepted the State's proffered race-

---

[15]     St. R. Vol. 50 at 12637.
[16]     R. Doc. 43 at 6.

neutral explanations for striking jurors Florence and Hughes.  *State v. Jacobs*, 32 So. 3d 227, 231-37 (La. 2010) (per curiam) (citing *Thaler v. Haynes*, 559 U.S. 43 (2010) (per curiam)) [hereinafter Jacobs II].  The Louisiana Supreme Court granted Jacobs a partial rehearing to clarify the issues on remand to the Louisiana Fifth Circuit Court of Appeal and to offer a reasoned opinion regarding the propriety of the decisions of then Associate Justices Knoll and Guidry not to recuse from Jacobs' case.  *State v. Jacobs*, 37 So. 3d 994 (La. 2010).  Jacobs contended that Justice Knoll could not properly consider the case because she had a familial relationship with a prosecutor in the Jefferson Parish District Attorney's office during Jacobs' first prosecution.  *Id.* at 995.  The Louisiana Supreme Court found this contention to be without merit because Justice Knoll's family member had left the District Attorney's office before Jacobs was re-indicted in 2002.  *Id.* Jacobs also argued that Justice Guidry should have recused because, as a trial judge, he denied a motion by a defendant in an unrelated trial to offer the Black Strikes report during a *Batson* challenge on the grounds that the report was flawed.  *Id.*  The Louisiana Supreme Court concluded that this was not a basis for recusal because the report was not before the court.  *Id.*

On remand, the Louisiana Fifth Circuit discussed all of Jacobs' remaining assignments of error, including the remainder of the *Batson* claim

and the assertion that the trial court had erred in admitting Jacobs' custodial statement, and concluded that each was meritless.  *State v. Jacobs*, 67 So. 3d 535 (La. App. 5 Cir. 2011).  The Louisiana Supreme Court denied review. *State v. Jacobs*, 80 So. 3d 468 (La. 2012).

### B.    Federal Court

Jacobs originally filed his petition for habeas corpus relief on April 24, 2015, challenging his 2006 conviction.[17]  Shortly after Jacobs filed the petition, Magistrate Judge Joseph Wilkinson stayed the proceedings,[18] pending the resolution of Jacobs' second petition for certiorari to the United States Supreme Court based on its decision in *Montgomery v. Louisiana*, 577 U.S. 190 (2015), which held that the rule announced in *Miller v. Alabama*, 567 U.S. 460 (2012), barring mandatory life imprisonment without the possibility of parole for juvenile offenders, applied retroactively on collateral review.  On March 7, 2016, the Supreme Court granted Jacobs' writ for certiorari on the issue of the legality of Jacobs' sentence, determined that Jacobs' sentence did not comply with *Montgomery*, and remanded the case to the state courts to resentence Jacobs.  *Jacobs v. Louisiana*, 577 U.S.

---

[17]    R. Doc. 1.
[18]    R. Doc. 7.

1187 (2016). Magistrate Judge Wilkinson then granted Jacobs another stay while his case proceeded in state court.[19] On remand, the state trial court resentenced Jacobs to two terms of life imprisonment with parole eligibility.[20]

On April 12, 2021, this Court granted Jacobs' motion to reopen the case and directed Jacobs to file an amended and superseding petition for habeas corpus relief providing an updated statement of the state court proceedings and a concise statement of the issues and arguments remaining before this Court.[21] Jacobs filed the amended petition on May 12, 2021.[22] The amended petition sought relief on eleven grounds: (1) racial discrimination in the selection of Jacobs' petit jury violated the Equal Protection Clause; (2) judicial bias tainted the Louisiana Supreme Court's decision to reverse a grant of *Batson* relief during state court proceedings; (3) the trial court violated Jacobs' Sixth and Fourteenth Amendment rights to counsel of his choice; (4) Jacobs was tried pursuant to an indictment infected with race and gender discrimination; (5) Jacobs' counsel was ineffective for failing to challenge the State's use of a defective indictment; (6) the trial court

---

[19]    R. Docs. 7 & 10.
[20]    R. Doc. 43 at 16; R. Doc. 38 at 4.
[21]    R. Doc. 21.
[22]    R. Doc. 25.

admitted Jacobs' custodial statements in violation of his Fifth, Sixth, and Fourteenth Amendment rights; (7) the trial court unconstitutionally excluded prosecutors' statements that Jacobs "didn't commit a murder"; (8) Jacobs was convicted on insufficient evidence in violation of his Fourteenth Amendment Due Process rights; (9) Jacobs' counsel conceded certain elements of the offense, depriving Jacobs of effective assistance of counsel and right to a jury trial; (10) the exclusion of relevant evidence and admission of irrelevant and prejudicial evidence deprived Jacobs of his rights to due process and a fair trial, and counsel was ineffective for failing to object to the autopsy "rod" photographs; and (11) the trial court erroneously denied Jacobs' proposed jury instructions on lenience and the rights of the jury.[23]

The petition was referred to Magistrate Judge Donna Phillips Currault, who issued an R&R finding that Jacobs was not entitled to relief on any claim, and recommending dismissal of the petition with prejudice.[24]  Jacobs filed specific objections to the findings contained in the R&R with respect to the *Batson* claim, the Sixth Amendment counsel of choice claim, the due process judicial bias claim, the claim regarding the legality of the indictment,

---

[23]     R. Doc. 25.
[24]     R. Doc. 43.

and the claim that the trial court admitted a custodial statement in violation of Jacobs' Fifth, Sixth, and Fourteenth Amendment rights.[25]

The Court addresses Jacobs' objections below.

## II.   LEGAL STANDARD

The Court applies *de novo* review to the parts of the R&R to which the parties objected.  Fed. R. Civ. P. 72(b)(3).  The Court is limited to plain-error review of any part of the R&R not subject to a proper objection.  *Starns v. Andrews*, 524 F.3d 612, 617 (5th Cir. 2008).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") defines "[t]he statutory authority of federal courts to issue habeas corpus relief for persons in state custody." *Premo v. Moore*, 562 U.S. 115, 120 (2011).  Under AEDPA, a federal habeas court may not grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court, unless the state court adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[25]   R. Doc. 48.

*See* 28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  "A state court decision involves an unreasonable application of federal law if it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'"  *Cobb v. Thaler*, 682 F.3d 364, 373 (5th Cir. 2012) (quoting *Williams*, 529 U.S. at 407-08).  This demanding standard is "met only 'in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents.'"  *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings' . . . and 'demands that state-court decisions be given the benefit of the doubt." (internal citations omitted)).  The state court's findings of fact are entitled to a presumption of correctness, and they can be rebutted only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

## III.  DISCUSSION

### A.  *Batson*

Jacobs objects to multiple aspects of the R&R's recommendation on his

*Batson* claim.[26]  At the trial court level, a *Batson* analysis consists of three

steps:

> First, a defendant must present a prima facie case that the prosecution exercised its peremptory challenges on the basis of race.  Second, if the defendant meets this initial burden, the burden shifts to the prosecutor to present a race-neutral explanation for striking the jurors in question.  Finally, the court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (citations omitted).

In this case, the trial court judge did not make an explicit ruling at *Batson*'s

first step, but he directed the State to offer race-neutral reasons for the

challenged strikes.[27]  As a result, the first step was mooted, and during the

*Batson* challenges in the trial court, the prosecutor, defense counsel, and the

judge discussed each challenged strike and the proffered explanations for the

strike.  Defense counsel explained why she believed the explanations were

pretextual, and the judge determined whether each strike was motivated by

racial discrimination based on his perception of the prospective jurors'

---

[26]  Jacobs notes in his objections that "[t]he bulk of this filing is analyzing the denial of the [*Batson* claim]."  R. Doc. 48 at 3.

[27]  St. R. Vol. 50 at 12622.

demeanors and answers to voir dire questions and the prosecutor's credibility.[28]  *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation and the trial judge has ruled on the ultimate question of racial discrimination, the preliminary issue of whether the defendant made a prima facie showing is moot.").  The trial judge found that the defense had failed to meet its burden on the third step of demonstrating that any of the challenged strikes showed purposeful discrimination by the State.[29]

On direct appeal, the Louisiana Fifth Circuit discussed the defense's challenges to five jurors—Hughes, Florence, Auzenne, Jordan, and Stevenson—and concluded that the State struck jurors Florence and Hughes based on race.  *Jacobs*, 13 So. 3d at 689-95.  The court concluded that, with respect to the other jurors, where it found no reversible error, the trial court should have made explicit findings regarding the jurors' demeanors.  The court also found it "unlikely" that the disparity in the State's use of seven of its eight peremptory challenges to strike non-white jurors, while non-white jurors made up only 19% of total prospective jurors, was "pure chance."  *Id.* at 688-89.  In addition, the court discussed concerns about disparities in the

---

[28]      *Id.* at 12621-75, 12758-61.
[29]      *Id.* at 12675, 12661.

State's questions directed to non-white jurors and white jurors.  The court did not discuss any other statistical or historical evidence of discrimination.

The Louisiana Supreme Court reversed the court of appeal, finding that the trial court had properly accepted the prosecutor's race-neutral explanation for striking jurors Florence and Hughes, and that the trial judge was not required to make explicit findings on the record concerning the jurors' demeanors, citing *Thaler v. Haynes*, 559 U.S. 43 (2010) (per curiam). *Jacobs II*, 32 So. 3d at 233-35.  The Supreme Court also noted that while, "[f]rom a purely statistical standpoint," the disparity in the State's use of peremptory strikes was unlikely to be pure chance, the record as a whole "did not evince a racially-discriminatory intent" with respect to any of the strikes. *Id.* at 236-37.  Further, the Supreme Court found that the Louisiana Fifth Circuit accorded too much weight to Jacobs' arguments concerning disparate questioning.  *Id.* at 236.  The Supreme Court stated that, based on its "review of the information provided by the appellate court," each of the first three voir dire panels contained non-white prospective jurors, and a last, fourth panel was the only panel with all white prospective jurors.  *Id.*  The Supreme Court reasoned that the prosecutors' "compress[ing] his questioning near the end of voir dire is far different than if disparate questioning occurred between the first and second panels, had there been all white prospective

jurors in one and non-white prospective jurors in the other." *Id.* The Court concluded that, in light of the record as a whole, "the factor of disparate questioning loses the significance given to it by the [court of appeal]." *Id.*

On remand, the Louisiana Fifth Circuit Court of Appeal discussed only the defense's challenges to two other prospective jurors, Viola Hawkins and Tempy Dillon. The court concluded that the trial court had properly accepted the race-neutral explanations proffered by the State for both jurors.

In this Court, the only issue is whether the state courts erred by unreasonably applying *Batson*'s third step, at which "all of the circumstances that bear upon the issue of racial animosity must be consulted," *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008), or by reaching an unreasonable determination of the facts in light of the evidence presented to the state courts. "[A] state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). Under the AEDPA, this finding is "presumed correct absent clear and convincing evidence to the contrary." *Id.* at 340. Because Jacobs' *Batson* claims were adjudicated on the merits by the state courts, he must show that the courts' conclusions were "objectively unreasonable in light of the evidence presented in the state court proceedings." *Id.* "Deference to trial court findings on the issue of discriminatory intent makes

particular sense" in the context of *Batson*'s third step because that finding "largely will turn on evaluation of credibility." *Hernandez*, 500 U.S. at 365 (quoting *Batson*, 476 U.S. at 98 n.21).

Jacobs objects (1) to the state courts' exclusion of the Black Strikes report and the R&R's finding that the report is not before this Court;[30] (2) that the R&R overlooks evidence of racial bias from the history of the case;[31] and (3) that the R&R performs the comparative juror analysis "in a vacuum," without considering contextual evidence of discrimination.[32]

### 1.   The "Black Strikes" Report

Jacobs offered the Black Strikes report in the trial court during the *Batson* challenge as evidence of intentional discrimination at *Batson*'s third step.[33]   The trial court excluded this report.[34]   On direct appeal, Jacobs attempted to argue that the Black Strikes report demonstrated that the peremptory strikes in this case were motivated by racial discrimination, but did not assign error to the trial court's exclusion of the report.[35]   In the

---

[30]   R. Doc. 43 at 49; R. Doc. 48 at 6-8.
[31]   R. Doc. 48 at 9-13.
[32]   *Id.* at 17-21.
[33]   St. R. Vol. 50 at 12637.
[34]   *Id.*
[35]   St. R. Vol. 53 at 13133-36.

Louisiana Fifth Circuit's original opinion, the court did not discuss the report. The Louisiana Supreme Court did not address the report in its opinion, because it pretermitted that portion of the *Batson* analysis for resolution by the Louisiana Fifth Circuit on remand. *Jacobs*, 37 So. 3d at 995. On remand, in the last reasoned decision on the issue, the Louisiana Fifth Circuit Court of Appeals stated:

> On appeal, [Jacobs] states that the trial judge erred in refusing to allow him to introduce evidence of "historical discrimination" before and during trial. First, [Jacobs] did not brief this issue, so it is deemed abandoned. U.R.C.A. Rule 1-3; Rule 2-12.4. Second, [Jacobs] did not proffer the evidence that he sought to introduce, so, even if this argument was briefed, we have nothing to review. Each of the other claims are addressed with respect to the prospective juror in question.

*Jacobs*, 67 So. 3d at 554 n.16.

On the basis of the Louisiana Fifth Circuit's conclusion that issues concerning the report were not properly preserved for its review, Magistrate Judge Currault found that this Court may not properly consider the report, since, under the AEDPA, as interpreted by the U.S. Supreme Court in *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011), this Court's review is limited to the factual record before the state courts.[36] Jacobs objects to this finding, contending that, first, the report is before this Court because he raised the

---

[36] R. Doc. 43 at 49.

issue of its exclusion at every opportunity;[37] second, the trial court's exclusion of this evidence was an unreasonable application of *Batson* because the trial court was required to consider all the evidence;[38] and third, that the report demonstrates that the state courts' finding of no discriminatory intent was unreasonable.[39]

While Jacobs' counsel stated that she was "proffering" the Black Strikes report as part of an evidentiary packet during the first *Batson* challenge in the trial court, the record reflects that she did not make an offer of proof after the trial judge ruled to exclude the evidence, and the report was never entered into the record.  At the beginning of the first *Batson* challenge, defense counsel sought to introduce into evidence documents that included the Black Strikes report.[40]  The prosecutor immediately objected.[41]  Defense counsel responded, "Your Honor, I haven't offered anything yet so there's nothing for them to object to until I tell you what I'm offering.  Okay?"[42]  The trial judge stated, "[t]hat's fine.  Proceed."[43]  The State and the defense

---

[37]    R. Doc. 48 at 6-11.
[38]    R. Doc. 48 at 8-9.
[39]    *Id.* at 11.
[40]    St. R. Vol. 50 at 12629.
[41]    *Id.*
[42]    *Id.* at 12630.
[43]    *Id.*

proceeded to discuss the admissibility of the Black Strikes report.[44]  Finally, the trial judge stated, "[t]he Court denies the motion."[45]  After that, defense counsel noted her objection to the ruling and the parties began discussing individual jurors.[46]  The record reflects that at no time after the judge's ruling did the defense attempt to proffer or make an offer of proof of the report itself.  *See State v. Willis*, 367 So. 3d 948, 954 (La. App. 2 Cir. 2023) (noting that, to preserve objection to evidentiary rule, a party must proffer the evidence once "the trial court rules evidence inadmissible"); Michael Graham, 2 Handbook of Fed. Evid. § 103:7 (9th ed. Nov. 2023 Update) ("If the evidence excluded consists of a document authenticated in the record or by offer of proof, a sufficient offer of proof is made by requesting the reporter to insert the exhibit in the record.").  Accordingly, the report was not made part of the state court record, and Magistrate Judge Currault correctly concluded that this Court may not consider it.

Further, the Louisiana Fifth Circuit cited two procedural bars to Jacobs' claim.  A federal habeas court "will not review a claim rejected by a state court if the decision of the state court rests on a state ground that is independent of the federal question and adequate to support the judgment,"

---

[44]   *Id.* at 12630-37.

[45]   *Id.*

[46]   *Id.*

including procedural barriers. *Walker v. Martin*, 562 U.S. 307, 315 (2011) (internal quotation marks omitted). "[A] basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default that is based upon an adequate and independent state ground." *Buntion v. Lumpkin*, 982 F.3d 945, 951 (5th Cir. 2020) (quoting *Smith v. Johnson*, 2167 F.3d 521, 523 (5th Cir. 2000)); *see also Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) ("A federal habeas court 'does not have license to question a state court's finding of procedural default' or to question 'whether the state court properly applied its own law.'"); Brian Means, *Federal Habeas Manual* § 9B:22 (2016) ("Federal courts generally will not consider whether the state court properly applied its default rule to the petitioner's facts."). When a state court invokes an independent and adequate procedural rule, federal habeas review is barred, unless "the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004). An independent and adequate bar is one that is "firmly established and regularly followed." *Wright v. Quarterman*, 470 F.3d 581, 586 (5th Cir. 2006) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). It is the petitioner's burden to demonstrate that a rule is not regularly applied. *Id.*

Here, the Louisiana Fifth Circuit specifically invoked Louisiana Uniform Rules of Appeal ("U.R.C.A.") 1-3 and 2-12.4 in determining that Jacobs' claim of error relating to the Black Strikes report was procedurally barred.  Rule 1-3 provides that the scope of review will be limited to "issues that were submitted to the trial court and that are contained in specifications or assignments of error."  U.R.C.A. 1-3.  Rule 2-12.4 establishes briefing requirements that parties must meet to preserve claims for review.  *Id.* 2-12.4.  Federal courts have consistently held that U.R.C.A. 1-3 is an adequate and independent procedural bar.  *See, e.g.*, *Semien v. Warden*, No. 8-162, 2009 WL 1393316, at *7 (W.D. La. May 12, 2009); *Pierce v. Warden, La. State Penitentiary*, No. 06-1185, 2009 WL 55937, at *16 (W.D. La. Jan. 6, 2009).  Federal courts have also held that U.R.C.A. 2-12.4 is an adequate and independent procedural bar.  *See, e.g.*, *Williams v. Vannoy*, No. 15-2235, 2017 WL 2303511, at *11 (E.D. La. Mar. 7, 2017) (collecting cases).  Jacobs has not presented evidence or argument indicating that either bar is not regularly applied.  Further, Jacobs does not present evidence or argument concerning cause for the failure to comply with Louisiana procedural rules or prejudice arising from the court's invocation of the rules.

As to U.R.C.A. 1-3, Jacobs' original brief, filed before the Louisiana Fifth Circuit issued its original opinion in 2009, included an assignment of

error that "Racial Discrimination Infected Jury Selection."[47]  The Louisiana

Fifth Circuit could have reasonably concluded that this assignment of error

was insufficient under U.R.C.A. 1-3 to preserve the issue regarding the Black

Strikes report in 2011 when it considered the case on remand from the

Louisiana Supreme Court.  The assignment of error does not refer to the trial

court's exclusion of the Black Strikes report.  The other assignments of error

to the trial court's evidentiary rulings in the appeal brief are clearly

designated as such.  For example, assignment of error number 8 states, "The

Trial Court's Exclusion of Relevant Evidence Violated Lawrence Jacobs'

Right to Due Process and a Fair Trial."[48]  Indeed, in the Louisiana Fifth

Circuit's original decision reversing Jacobs' convictions and ordering a new

trial based on its conclusion that the trial court erred in its *Batson* analysis,

the court did not refer to the report or Jacobs' argument concerning it.  *See*

*Jacobs*, 32 So. 3d at 688-89.  Accordingly, the Court finds that review of the

state courts' exclusion of the Black Strikes report is foreclosed by the AEDPA

based on the Louisiana Fifth Circuit's invocation of an independent and

adequate procedural bar with respect to U.R.C.A. 1-3.

---

[47]     St. R. Vol. 53 at 13126.

[48]     *Id.*

As to U.R.C.A. 2-12.4, Jacobs' brief did not specifically refer to the Black Strikes report or include the report itself.  Thus, the Louisiana Fifth Circuit could have reasonably concluded that the brief did not meet the requirements of U.R.C.A. 2-12.4 on this issue.  For instance, the brief referred only to "historical evidence concerning the prosecution's use of race-based decision making," and stated that this evidence would have shown "that over the course of the preceding ten years, in over five hundred jury trials, the State had struck African-Americans at a rate three times higher than white jurors."[49]  It is not clear that this contention relates to an extrinsic academic report prepared based on statistics compiled by private parties, rather than historical evidence compiled and presented by Jacobs.  And it is even less clear that this contention relates to the Black Strikes report itself, since that report states that it examined data from less than four hundred trials over the course of eight years.[50]  Accordingly, the Court finds that review of the state courts' exclusion of the Black Strikes report is foreclosed by the AEDPA based on the Louisiana Fifth Circuit's invocation of an independent and adequate procedural bar with respect to U.R.C.A. 2-12.4.

---

[49]     *Id.* at 13135.

[50]     Black Strikes Report, *supra* note 19, at 5.

Based on the foregoing, the Court overrules Jacobs' objection to the R&R's conclusion that he is not entitled to habeas relief on the basis of the Black Strikes report.

### 2.   *Evidence of Racial Bias from the History of the Case and the Sufficiency of the Comparative Juror Analysis*

In Jacobs' amended petition, he asserts that the state courts unreasonably applied *Batson* by failing to consider evidence of historical discrimination by the Jefferson Parish District Attorney's Office and by failing to adequately weigh evidence of disparate questioning by the prosecutor during voir dire in Jacobs' retrial.[51]  In his objections, he contends that the R&R makes the same mistake, and that as a result of Magistrate Judge Currault's failure to consider this historical and contextual evidence, the comparative juror analysis in the R&R overlooks the evidence of pretext in the State's proffered explanations for its strikes.[52]  But Magistrate Judge Currault correctly identifies the standards governing *Batson*'s third step, including the requirement to consider "all of the circumstances that bear upon the issue of racial animosity." *Snyder*, 552 U.S. at 478.  Further, the Magistrate Judge expressly refers to Jacobs' arguments concerning historical

---

[51]   R. Doc. 25 at 11-16.
[52]   R. Doc. 48 at 17-18.

racial discrimination and the role they play his *Batson* claim.  The court noted Jacobs' contention that the trial's occurrence in an "era of endemic race discrimination in jury selection in Jefferson Parish" demonstrates that the prosecutor's explanations were pretextual, but pointed out that many of the historical incidents that Jacobs points to in this Court were not raised before the state courts.[53]  Magistrate Judge Currault's comparative juror analysis accurately and exhaustively details the State's proffered explanations for striking each juror and the evidence Jacobs marshals to show that each explanation is pretextual.[54]  This is the proper technique for performing comparative juror analysis: Jacobs' proffered evidence of historical discrimination is contextually relevant, but it does not have to be restated or re-referenced in each paragraph.[55]  *See Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir. 2006) ("The trial court is not compelled to make intricate factual findings in connection with its ruling in order to comply with *Batson*."); *Davis v. Ayala*, 576 U.S. 257, 271-85 (2015) (performing

---

[53]    R. Doc. 43 at 47 & 49.

[54]    *Id.* at 51-55.

[55]    Jacobs appears to understand this, since his briefing performs the comparative juror analysis in the same way, without expressly referencing the historical practices of the Jefferson Parish District Attorney's office when examining a specific juror that the State struck and their allegedly similarly-situated counterpart that the State accepted.  *See* R. Doc. 25 at 22-32; R. Doc. 42 at 15-31; R. Doc. 48 at 17-39.

comparative juror analysis by examining proffered explanations without reiterating context and concluding state courts' factual findings were not unreasonable despite "pattern of peremptory challenges . . . sufficient to raise suspicions about the prosecution's motives").

Further, Magistrate Judge Currault is correct in noting that much of the historical evidence of discrimination that Jacobs refers to in this Court was not raised in the state trial courts or on appeal and does not relate to the issue of jury selection in the instant case. In his objections, five of the historical incidents of discrimination that Jacobs alleges the state courts and the R&R failed to consider were not raised before the state courts in Jacobs' *Batson* arguments: (1) an unidentified Jefferson Parish prosecutor's statement at an unrelated capital murder trial in 1995 that she struck a prospective juror because he was Black; (2) the Louisiana Supreme Court's remand of a noncapital case in 1997 because the unidentified trial judge in that case failed to rule on *Batson* challenges; (3) a pretrial motion filed in 1997, before Jacobs' first trial, by a lead prosecutor at Jacobs' second trial, stated that "[t]he district attorneys in this State form a white male club;" (4) a statement by a prosecutor in Jacobs' first trial, who left the Jefferson Parish Prosecutor's Office before Jacobs' retrial, that, "[w]e have a race neutral reason, and we could strike every black in every panel if there were a race

neutral reason;" and (5) the prosecutor's "glib" written response to the defense's efforts to bar them from wearing objectionable neckties in future appearances.[56]

Five historical incidents of discrimination that Jacobs refers to in this Court were raised in the state courts, either before the trial judge during the *Batson* challenge or in Jacobs' briefs on appeal: (1) Jefferson Parish prosecutors' violation of *Batson* in *Snyder v. Louisiana*, 552 U.S. 472 (2008); (2) Jefferson Parish prosecutors' attempts to strike 44 out of 49 qualified Black prospective jurors in twelve capital trials, including Jacobs', according to an amicus brief filed in *Snyder* in the United States Supreme Court; (3) evidence of racial discrimination contained in the Black Strikes report; (4) prosecutors' wearing neckties with nooses painted on them at pretrial hearings in this case; and (5) a metaphor used by the prosecutor during closing arguments at Jacobs' retrial, describing Jacobs as a predator on the prowl in a jungle.[57]

As to number (1), that the trial judge in this case presided over another case in which the prosecution violated *Batson* is not strong evidence of a *Batson* violation in this case, since *Batson*'s third step requires the Court to

---

[56]   R. Doc. 48 at 9-10.

[57]   *Id.*

inquire into the motives of the prosecutor, not the trial judge.  As to number (2), while Jacobs referred to this statistic from an amicus brief in *Snyder* in his brief on direct appeal, he did not include a copy of the amicus brief submitted to the U.S. Supreme Court in his state court briefing.   The information contained in an amicus brief is not appropriate for judicial notice, and there has been no foundation laid as to the soundness of these statistics.  *See* Fed. R. Ev. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it is . . . is generally known . . . or . . . can be . . . readily determined from sources whose accuracy cannot reasonably be questioned."); *Gutierrez v. Harpstead*, No. 20-398, 2023 WL 2189979, at *3 (D. Minn. Jan. 20, 2023), *report and recommendation adopted*, 2023 WL 2189054 (D. Minn. Feb. 23, 2023) (noting that "the Court need not (and should not) take judicial notice of the contents of the [amicus] brief [filed in another case]; the Court may simply evaluate the persuasive value of the document, as it would any other document").  This evidence is, at best, weak, indirect evidence of the prosecutor's motives in voir dire in this case.  As to number (3), the Black Strikes report was not part of the state court record and may not be considered by this Court, as discussed above.  As to number (4), the prosecutors' decisions to wear neckties with noose imagery on them early in the case were racially insensitive and objectionable.

Nevertheless, this event occurred three years before voir dire in this case and, as Jacobs acknowledges, the District Attorney called the neckties "totally inappropriate."[58]   The source cited by Jacobs recounting the event also quotes the District Attorney as stating that he prohibited his staff from wearing the ties to work.[59]

As to number (5), Jacobs argues that the prosecutor's use of a metaphor in closing arguments likening Jacobs and his codefendant Roy Bridgewater to predators in a "jungle" demonstrates that the prosecutor acted with racial prejudice during voir dire.[60]   When attempting to describe Jacobs and Bridgewater as seasoned criminals and pointing to Jacobs' commission of a crime similar to the robbery of Nelson and Della Beaugh early the morning before, the prosecutor likened Jacobs and Bridgewater to predators on the prowl for crime victims like prey in the jungle.[61] At no other time in the closing argument, which spanned over twenty transcript pages, did the prosecutor refer to the "jungle" or liken Jacobs to a predator, and he never used the word "animal" in reference to Jacobs.

---

[58]   *Id.* at 10.
[59]   *Id.* (citing Jeffrey Gettleman, Prosecutors' Morbid Neckties Stir Criticism, New York Times (Jan. 5, 2003), available at https://www.nytimes.com/2003/01/05/us/prosecutors-morbid-neckties-stir-criticism.html).
[60]   *Id.* at 10.
[61]   St. R. Vol. 54. at 13533.

First, the trial judge could not have considered this metaphor during the *Batson* challenges because it occurred in closing arguments, after voir dire had concluded. *See Hightower v. Terry*, 459 F.3d 1067, 1070 (11th Cir. 2006) (holding that district court properly refused to consider new *Batson* argument on habeas review and that "we were, and are post-*Miller-El*[, 545 U.S.], limited to the evidentiary record developed in the state trial court during jury selection and the trial court's ruling," as well as briefs and opinions on direct appeal).  Second, the comments are substantively not relevant as they were not part of the circumstances in which the prosecutor exercised his peremptory challenges.  *See Williams v. Woodford*, 384 F.3d 567, 584 (9th Cir. 2004) (finding allegedly racist analogy made in closing argument irrelevant to *Batson* challenge because it was not part of the circumstances concerning the prosecutor's use of peremptory challenges (quoting *Batson*, 476 U.S. at 97 (in evaluating *Batson* challenge, trial court must consider "evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial"))), *cert. denied*, 546 U.S. 934 (2005).

Ultimately, while the Louisiana Supreme Court and the Louisiana Fifth Circuit did not explicitly discuss the historical incidents of discrimination that Jacobs points to, many of the incidents were not properly raised in front of the state courts.  Moreover, state courts are not required to "show their

30

work in *Batson* decisions by mentioning every relevant circumstance." *King*, 69 F.4th at 869; *see also Miller-El*, 537 U.S. at 347 ("We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it."). That a state court "failed to 'mention' evidence" is insufficient to prove that it "failed to consider that evidence." *King*, 69 F.4th at 869; *see also Splawn v. Thaler*, 494 F. App'x 448, 453 (5th Cir. 2012) ("[W]e are not at liberty to grant [p]etitioner's application for habeas relief simply because we would prefer a more detailed explanation of the [state] court's decision[.] . . . Our focus . . . should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." (citations and quotations omitted) (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002))); *United States v. Vann*, 776 F.3d 746, 754 (10th Cir. 2015) ("[O]ur case law makes clear that the district court does not need to make a finding on the record with respect to how it assessed the evidence to rule on the *Batson* challenge. The bottom line is that a paucity of reasoning on the record to support the ultimate finding of nondiscrimination does not per se amount to a legal error in the application of *Batson*."), *cert. denied*, 136 S. Ct. 434 (2015). Jacobs has not demonstrated that the state courts

unreasonably applied *Batson* by failing to consider the historical context of the trial simply because they did not recite it.

As to Jacobs' argument concerning disparate questioning, the state courts, and the R&R,[62] did consider whether the prosecutor in Jacobs' case engaged in racially motivated disparate questioning during voir dire. In the last reasoned decision on the issue, the Louisiana Supreme Court concluded that any disparate questioning by the prosecutor was not significant evidence of racially discriminatory intent in this case. *Jacobs II*, 32 So. 3d at 236. Based on its review of "the information provided by the appellate court," the Louisiana Supreme Court interpreted Jacobs' disparate questioning argument to be that the prosecutor asked additional questions "[t]o panels with non-white prospective jurors" that he "did not pose . . . to panels with only white prospective jurors." *Id.* The Supreme Court stated that each of the first three panels of prospective jurors contained non-white jurors, and "[c]onsidering the racial make-up of the entire voir dire," the only all-white panel "would have been" the fourth panel. *Id.* It noted that the fourth panel was present for the questioning of all other panels, and the parties needed to select only a few jury members or alternates from the panel. *Id.* Thus, the Supreme Court reasoned that, even if the prosecutor did omit certain

---

[62]   R. Doc. 43 at 50.

questions to the fourth, all-white panel, such as whether panelists had family members in jail, these differences in questioning were not compelling evidence of racially discriminatory intent because "compressing . . . questioning near the end of voir dire is far different than if disparate questioning occurred between the first and second panels, had there been all white prospective jurors in one and non-white prospective jurors in the other." *Id.* Thus, the Supreme Court found that "the factor of disparate questioning loses the significance given to it by the" Louisiana Fifth Circuit Court of Appeal in its 2009 opinion. *Id.*

In this Court, Jacobs argues that the Louisiana Supreme Court's finding as to disparate questioning was unreasonable because, while there was a Hispanic prospective juror, Hughes, in the first panel, there were no Black prospective jurors in that panel.[63] The Court has reviewed the state record, the habeas petition, the R&R, and Jacobs' objections, and finds that, although the Louisiana Supreme Court misstated the record in its analysis on disparate questioning, its conclusion was reasonable. *See Holland v. Rivard*, 800 F.3d 224, 236 (6th Cir. 2015) (holding that "AEDPA deference applies to the state court's decision" even when it is based on erroneous reasoning), *cert. denied*, 577 U.S. 1197 (2016). As an initial matter, the

---

[63]    R. Doc. 48 at 18-19.

Louisiana Supreme Court's statements that there was a fourth panel and that this "last panel would have consisted of only white prospective jurors" was incorrect because only three panels were questioned during voir dire.  The record reflects that after the third panel was questioned, the jury was sworn in.[64]  As a result, all of the jury panels that were questioned contained non-white prospective jurors, and there were no all-white panels.  Nevertheless, the Court "reviews 'only the ultimate legal determination by the state court— not every link in its reasoning.'"  *Shore v. Davis*, 845 F.3d 627, 631 (5th Cir. 2017) (quoting *Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir. 2013)).  "[T]o succeed in showing that the state court's determination of facts was unreasonable," a federal habeas petitioner must "do more than simply show the erroneous nature of one individual fact-finding."  *Hoffman v. Cain*, 752 F.3d 430, 442 (5th Cir. 2014); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for [habeas relief], a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

---

[64]  *See* St. R. Vol. 50 at 12752-61 (finishing questioning of the third panel and swearing in the jury).

The Louisiana Supreme Court's determination that "the factor of disparate questioning" was not significant evidence of racially discriminatory motive was reasonable in light of the record.  While the Louisiana Supreme Court misstated the record, it recognized that evidence of disparate questioning would have been more compelling if the prosecutor had asked different questions to one panel with all white prospective jurors than he asked to another panel that contained non-white prospective jurors.  *Jacobs II*, 32 So. 3d at 236.  That did not occur in this case; all three voir dire panels contained non-white jurors.  While the record reflects that the prosecutor asked two questions—whether the prospective jurors knew anyone in jail and whether they had any problems with imposing a term of life imprisonment— to the second panel, which contained five Black prospective jurors, that he did not ask of the first panel, which contained one Hispanic prospective juror, he also did not ask these questions of the third panel, which contained two Black prospective jurors.

As to Jacobs' argument that the first panel did not contain Black jurors, Jacobs cannot simultaneously argue that the prosecutor viewed Hispanic juror Hughes as white for the purpose of disparate questioning, and as a non-white juror for the purposes of statistical analysis and the *Batson* claim.  The first panel was not composed of only white prospective jurors, so any

disparate questioning between the first and second panel as a whole is not persuasive evidence of racial discrimination in the same way that evidence of disparate questioning between one all-white panel and one mixed-race panel would be, or evidence of disparate questioning between individual jurors of different races.

Further, "disparate questioning or investigation alone does not constitute a *Batson* violation." *Flowers*, 588 U.S. at 310. The Louisiana Supreme Court acknowledged Jacobs' disparate questioning argument and simply concluded that the prosecutor's asking different questions to different panels was not significant evidence of racial discrimination. It did not conclude that the evidence was irrelevant or nonexistent. In *Flowers v. Mississippi*, the U.S. Supreme Court found that disparate questioning was significant evidence of racial discrimination when the State asked the five Black prospective jurors whom it struck 145 questions in total, while the State asked the eleven white jurors who were ultimately seated on the jury only 29 questions. 588 U.S. at 308. This was not a matter of adding one line of questioning between panels, but a "dramatic" disparity between white and Black prospective jurors persisting within each panel that could not "be explained away or categorized as mere happenstance." *Id.* at 311 (quoting *Flowers v. State*, 240 So. 3d 1082, 1161 (Miss. 2017) (King, J., dissenting)).

36

Based on the foregoing discussion, the Court finds that Jacobs fails to show that the Louisiana Supreme Court's conclusion about the value of Jacobs' disparate questioning evidence was erroneous.

Having reviewed Jacobs' historical evidence of discrimination and arguments about disparate questioning, the Court will now conduct a *de novo* review of the state courts' comparative juror analysis under AEDPA standards, considering all of the relevant circumstances.

### 1.   *Juror Hughes*

Juror Hughes was a Hispanic male.  In the state trial court, the prosecutor back-struck juror Hughes after the judge informed the parties that "there is a juror on the first panel that's asking to be excused."[65]  The judge stated that Hughes had informed his staff that he suffered from some kind of muscular problem, and that he would send a doctor's note in an attempt to be excused from service.[66]  The judge noted that he would not dismiss juror Hughes on that basis.[67]  The prosecutor then back-struck Hughes.[68]  In responding to the defense's *Batson* challenge, the prosecutor

---

[65]    St. R. Vol. 50 at 12612.
[66]    *Id.* at 12644.12612.
[67]    *Id.* at 12613.
[68]    *Id.*

first stated that he was unaware that Hughes was Hispanic.[69]   He then offered the race-neutral explanation that he struck juror Hughes because Hughes "brought to the Court's attention that he did not want to sit."[70] Defense counsel pointed to the prosecution's acceptance of juror Thibodeaux, who had a medical condition, like juror Hughes.[71]   The prosecutor asserted that Thibodeaux was different because she did not say she did not want to serve on the jury.[72]   To the contrary, the prosecutor pointed out that, once juror Thibodeaux was given crackers and something to drink, she was fine and wanted to serve.[73]   The trial judge found the prosecutor's explanation credible because juror Hughes was unique in expressing a desire not to serve, and Thibodeaux felt fine after she had some crackers.[74]

On direct appeal, the Louisiana Fifth Circuit Court of Appeal found the prosecutor's explanation for striking juror Hughes implausible, and found that the trial judge had erred in accepting it.  *Jacobs*, 13 So. 3d at 691.  The court stated that "the prosecutor challenged [ ] Hughes based on a 'medical

---

[69]     *Id.* at 12620.
[70]     *Id.* at 12621.
[71]     *Id.* at 12639-40.
[72]     *Id.* at 12641.
[73]     *Id.*
[74]     *Id.* at 12644-45.

condition,'" and found that, because there was no evidence concerning juror Hughes' medical condition on the record, the trial judge could not have assessed the plausibility of the explanation offered by the prosecutor. *Id.* at 690-91. Further, because the prosecutor had not asked juror Hughes about his medical condition, the explanation was likely pretextual. *Id.* at 691. Similarly, the court found that the prosecutor's failure to ask juror Thibodeaux about her diabetes indicated that the prosecutor's stated concern about juror Hughes' medical condition was pretextual. *Id.*

In the last reasoned decision on juror Hughes, the Louisiana Supreme Court reversed the court of appeal, holding that the prosecutor's explanation for striking juror Hughes was credible. The Louisiana Supreme Court noted that the trial judge would not have had any difficulty assessing the plausibility of the prosecutor's explanation because the judge's staff had received juror Hughes' request to be excused and the information about his medical condition before the parties did, and the judge was the one who explained this information to the parties. *Jacobs II*, 32 So. 3d at 230. Moreover, the Supreme Court noted that it made sense for the prosecutor to think that Juror Thibodeaux's diabetic condition was different from Hughes' muscular problem, since Thibodeaux could serve so long as she was given

sufficient accommodations, while Hughes asked to be released from the jury. *Id.* at 230-31.

In this Court, Jacobs argues that the Louisiana Supreme Court could not properly distinguish between juror Hughes' medical condition and juror Thibodeaux's since the prosecutor never made that distinction himself in the trial court.[75] Jacobs' argument is clearly contradicted by the record: as noted above, the prosecutor expressly distinguished between Hughes and Thibodeaux based on the fact that, as a result of Hughes' medical condition, Hughes did not want to sit, while Thibodeaux wanted to sit in spite of her medical condition because she was fine after receiving crackers and something to drink.  Thus, it was reasonable for the Louisiana Supreme Court to credit this explanation for the strike.

Jacobs also argues that the prosecutor did not ask enough follow-up questions to support the strike.  The record reflects that the prosecutor's explanation—that juror Hughes did not want to serve while juror Thibodeaux did—required no follow-up questions; the prosecutor already had all of the information he needed to render that explanation credible.  *See Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240, 1254-55 (11th Cir. 2014) (affirming district court's denial of habeas relief on *Batson* claim and citing

---

[75]    R. Doc. 48 at 22-24.

approvingly district court's finding that, in context, prosecutors' failure to ask follow-up questions did not give rise to inference of pretext); *Lamon v. Boatwright*, 467 F.3d 1097, 1102 (7th Cir. 2006) (noting that a failure to ask only suggests pretext when the context renders that failure suspect, and that a court may reasonably conclude that a prosecutor had all the information he needed to reach a conclusion about the desirability of a juror without asking additional follow-up questions).  Further, the trial judge in this case repeatedly encouraged the parties to attempt to compress their questioning and speed up voir dire, expressing concern about the pace of the process.[76] It was reasonable for the prosecutor to avoid asking questions he felt were unnecessary, especially if he did not think that a juror would ultimately serve on the jury.  Jacobs has not demonstrated by clear and convincing evidence

---

[76] *See, e.g.,* St. R. Vol. 50 at 12482 ("Hopefully these rounds won't take as long as the first round because they got to hear everything that went on in the first round."); *Id.* at 12536 ("I think yesterday it went on so long. You spent a lot of time with witnesses that obviously weren't going to be on the jury, and . . . we can pretty much save some time by not going into obvious witnesses that are not going to be on the jury."); *Id.* at 12763 ("[W]e're going to try to speed things up . . . depending on if we can do it just to try to make the day more productive."); St. R. Vol. 49 at 12458-59 (upon a juror's expression of concern that she was not feeling well and she had not expected voir dire to last 12 hours, the trial judge stated to defense counsel, "[i]t's over two-and-a-half hours on your part" and asked, "[h]ow much longer do you think you're going to be?").

that the Louisiana Supreme Court's conclusion as to juror Hughes was unreasonable.

### 2.   *Juror Hawkins*

Juror Hawkins was an African American female.  In the state trial court, the prosecutor stated that he struck juror Hawkins because she "was extremely adamant and extremely vocal that she wanted the defendant to testify."[77]  During the prosecutor's initial colloquy with juror Hawkins, she stated that she would want the defendant to testify to "prove his innocence" after a lengthy explanation by the prosecutor that a defendant has "a right not to testify," and that jurors "cannot hold it against" the defendant if he decides not to testify.[78]  The prosecutor gives another lengthy monologue explaining that the burden of proof rests with the State, and that a defendant does not need to prove his innocence.  At the end of the monologue, the prosecutor states, "Now, ma'am, I do appreciate your candidness and your honesty and if that's something that you believe, then I respect you for it," and asks, "Is there anything I can tell you to change your mind?"[79]  Juror

---

[77]   St. R. Vol. 50 at 12625.
[78]   *Id.* at 12520.
[79]   *Id.* at 12522-23.

Hawkins responds, "[n]o."[80]  The prosecutor continues to discuss this right and prospective jurors' perspectives on it for four more transcript pages, and concludes: "we're okay now.  Nobody needs him to testify except this lady here.  Is that correct ma'am?  Am I correct?"[81]  The woman responds, "yeah."[82]  The transcript does not record the speaker's name, but from the context of the entire colloquy, it is clear that the speaker is juror Hawkins.

The defense pointed to juror Vinturella as a comparator, whom the state had accepted and who said that "[i]t will be in the back of my mind if the defendant does not testify."[83]  During defense counsel's initial colloquy with Vinturella, defense counsel asked what verdict he would render if he had to render one immediately, before trial during voir dire.  Vinturella responded, "I haven't heard the evidence, so I'm presuming he's innocent until I hear the evidence."[84]  Later in the colloquy, Vinturella noted, "like I said, look at the evidence, listen to the evidence and then make a determination, but you're still going to have that thought in your head . . . as to why he didn't get on the stand."[85]  The prosecutor distinguished between

---

[80]    *Id.* at 12523.
[81]    *Id.* at 12527.
[82]    *Id.*
[83]    *Id.* at 12656.
[84]    *Id.* at 12601.
[85]    *Id.* at 12602.

Hawkins and Vinturella by pointing out that, "Vinturella never said that he would hold it against the defendant if the defendant decided not to testify. . . . That's what [juror] Hawkins said."[86]   The trial judge found the prosecutor's explanation credible, noting that "Vinturella said [he] presumed that the defendant was innocent until [he] hear[d] the evidence."[87]

Considering Jacobs' challenge on remand from the Louisiana Supreme Court, in the last reasoned decision, the Louisiana Fifth Circuit Court of Appeal held that the trial court properly accepted the prosecutor's explanation.  The court noted that "Hawkins stated that she would want defendant to testify to prove his innocence and that the prosecutor could say nothing to change her mind on that issue." *Jacobs*, 67 So. 3d at 557.  The court also pointed out that while juror Hawkins "implied that she would not hold defendant's failure to testify against him" when defense counsel attempted to rehabilitate her, she "still reiterated that she believed a defendant should testify." *Id.*

Jacobs argues in this Court that the prosecutor's explanation in the trial court was obviously pretextual because the State accepted white juror Vinturella and struck Black juror Hawkins when both indicated that they

---

[86]     *Id.* at 12657.
[87]     *Id.*

thought the defendant should testify, and Hawkins was "more equivocal" in asserting this belief than Vinturella.[88]   The Court has reviewed the trial transcript, the state court opinions, and the R&R, and concludes that this argument mischaracterizes Hawkins' voir dire responses and disregards large portions of the prosecutor's eight transcript-page colloquy with Hawkins in which she consistently reiterated that she would "need the defendant to testify" and that nothing could change her mind on this issue. After the discussion, the trial judge thought that "she[] obviously [would] not . . . be on the jury," because she "said that unless the defendant testified . . . she would hold it against him."[89]   When defense counsel attempted to rehabilitate her, she stated shortly and simply, "[w]ell, I won't hold it against him, *but that's what I believe, you know*."[90]   By contrast, at the outset of juror Vinturella's questioning, he expressly stated that he would "presum[e the defendant is] innocent until [he] hear[d] the evidence."[91]   When juror Vinturella said that it would "be in the back" of his head if a defendant did not testify, he explained that, "I don't think it's something that you can humanly—you know, like I said, look at the evidence, listen to the evidence

---

[88]   R. Doc. 48 at 26-28.

[89]   St. R. Vol. 50 at 12536.

[90]   *Id.* at 12538 (emphasis added).

[91]   *Id.* at 12601.

and then make a determination, but you're . . . going to have that thought in your head."[92]

In light of the strength with which Hawkins stated to the prosecutor her conviction that a defendant should testify, and the length of the colloquy in which she maintained that conviction while the prosecutor explained in multiple ways the defendant's right not to testify, the prosecutor could have reasonably concluded that her lukewarm statement on rehabilitative questioning did not alleviate his concerns about her perspective on the defendant's right to remain silent and that she was distinct from juror Vinturella, who did not say that he would hold it against the defendant if he did not testify and did not even say that he believed that a defendant should testify.  Jacobs does not present clear and convincing evidence that the Louisiana Fifth Circuit's holding with respect to juror Hawkins was unreasonable.

### 3.   *Juror Dillon*

Juror Dillon was an African American female.  In the trial court, the prosecutor explained that he struck juror Dillon because her voir dire

---

[92]    *Id.* at 12602.

responses indicated a sympathy towards runaway teenagers.[93]  Since Jacobs

was a runaway teenager, the prosecutor felt that this might show "a

proclivity, an inclination, a little bit of a motivation to side with the defense

during the case."[94]  The defense did not offer a specific comparator, but

stated that it "asked every panel about runaways[, and] [m]any, many, many

jurors said . . . a child might get hurt."[95]  The prosecutor disputed this

characterization, arguing that "[n]obody said that," and that "[w]hat they

said was they're teenagers, they make their own choices, they have to accept

their own responsibility and they have to make their own decisions."[96]  The

trial judge stated, "[o]ur notes say that she said she could only speak on her

own kids and she worried about them getting hurt out there and some kids

are more susceptible to being led by the wrong crowd," and denied the

*Batson* challenge, accepting the prosecutor's explanation.[97]

In the last reasoned decision, the Louisiana Fifth Circuit Court of

Appeal, on remand from the Louisiana Supreme Court, found no error in the

trial court's finding that the prosecutor did not strike juror Dillon on the

basis of discriminatory intent.  *Id.* at 558.

---

[93]     *Id.* at 12759.
[94]     *Id.* at 12760.
[95]     *Id.*
[96]     *Id.*
[97]     *Id.*

In this Court, Jacobs now compares juror Dillon's responses to those of juror Julia Smith.[98]  However, Jacobs did not raise this comparison in the trial court, in his briefing on direct appeal, or in his superseding petition for habeas relief in this Court.[99]  Accordingly, this comparison is not properly before this Court.  *See Chamberlin v. Fisher*, 885 F.3d 832, 844 (5th Cir. 2018) (requiring habeas court to give the prosecutor a chance to explain why he or she kept a juror before performing comparative analysis on *Batson* claim).  Jacobs presents no clear and convincing evidence that the court of appeal's conclusion with respect to juror Dillon was unreasonable.

### 4.    *Juror Florence*

Juror Florence was an African American female.  The prosecutor offered three explanations for striking juror Florence.  First, the prosecutor stated that he felt juror Florence had been asleep during most of the voir dire examination.[100]  Second, the prosecutor stated that he was concerned about the way that Florence had described her service as part of a hung jury in a drug trial.[101]  When the prosecutor reached Florence as he was questioning

---

[98]    R. Doc. 48 at 28-30.

[99]    R. Doc. 25 at 35-36.

[100]    St. R. Vol. 50 at 12627.

[101]    *Id.*

each juror who indicated that they had previously served on a jury, she offered, "[w]ell, this was crack cocaine and we all decided that we didn't know what to do."[102]   The prosecutor clarified, "[i]t was a hung jury."[103]   Juror Auzenne responded affirmatively, and the prosecutor moved on.[104]

During the *Batson* challenge, the prosecutor explained, "[s]he stated she was in a jury . . . and the jury was hung and that's okay, Judge.  I don't have a problem with that . . . But when she says to me we were hung because we didn't know what to do, well, that causes me some concern."[105]   He went on, "what concerned me more than anything is . . . [o]n a drug trial if you're stating that you're sitting back there on a jury and no one knows what to do that's not the type of juror that I want on a complicated long second-degree murder case," explaining that "[t]hat's not the type of juror that I want to go back into the jury room and at least express my views or defense counsel's view."[106]   Third, the prosecutor stated that Florence had a subpoena from his office to appear in another case that may be ongoing in which she may be the victim.[107]   Defense counsel asserted that a juror's sleeping while not being

---

[102]   *Id.* at 12495.
[103]   *Id.*
[104]   *Id.*
[105]   *Id.* at 12668.
[106]   *Id.* at 12669.
[107]   *Id.* at 12627.

questioned was not probative of the juror's ability to engage while hearing evidence, and that the prosecutor did not ask enough questions of juror Florence to support the strike on the basis of her service on a hung jury or her status under subpoena.[108]  The prosecutor responded that:

> [T]he way I was trained, most of the information that I gather from jurors [is] not when they're sitting up there when they've got their guard up.  It's when they're sitting back here and they don't think anybody is watching them.  That's the best time to look at jurors to see how they're sitting, how they're holding their purses, what their facial expressions are . . . That's the time as a trial lawyer when you want to see what jurors are doing."[109]

Finally, defense counsel compared juror Florence to juror Flanagan, who also served on a hung jury and whom the state accepted.[110]  The trial judge denied the *Batson* challenge without stated reasons.[111]  The state later accepted another white juror who had served on a hung jury, juror Rood, but did not have a chance to offer a distinction between Florence and Rood, since the trial judge had already ruled on the *Batson* challenge with respect to juror Florence.[112]

On direct appeal, the Louisiana Fifth Circuit Court of Appeal held that the prosecutor's explanations for striking juror Florence were pretextual.

---

[108]   *Id.* at 12665-67.
[109]   *Id.* at 12667-68.
[110]   *Id.* at 12665.
[111]   *Id.* at 12669.
[112]   *Id.* at 12685.

The court noted that the prosecutor did not ask juror Florence follow-up questions about her jury service or her subpoena, and concluded that "[t]he failure to ask undermine[d] the persuasiveness of the claimed concern." *Jacobs*, 13 So. 3d at 692 (quoting *Miller-El*, 545 U.S. at 250). Further, the court stated that there was no evidence in the record that juror Florence was sleeping. *Id*. The court also noted that the prosecutor asked juror Rood how she voted, and accepted her after she stated that she found the defendant in her case guilty. *Id*.

The Louisiana Supreme Court reversed the court of appeals. Initially, the Supreme Court noted that the court of appeal "recognized, without realizing the significance of the distinction, that [juror] Florence volunteered the information that the jury she previously served on had not known what to do, whereas [juror] Rood, when asked, did not indicate there had been any lack of understanding of the jury's role in her prior service." *Jacobs II*, at 231. The Supreme Court stated that this distinction alone would be sufficient to explain the difference in the prosecutor's treatment of the two jurors. *Id*. With respect to the subpoena, the Supreme Court also held that the prosecutor's knowledge that juror Florence had been the victim of a crime was a credible race-neutral reason that did not require follow-up inquiry. *Id*. at 232 (citing *State v. Harris*, 892 So. 2d 1238, 1261 (La. 2005); *State v.*

*Manning*, 885 So. 2d 1044, 1084-85 (La. 2004)).  Finally, the Supreme Court held that the trial judge could properly accept the prosecutor's explanation that juror Florence had been sleeping without making his own independent findings on the record, because his role was to assess the credibility of the prosecutor under *Thaler*, 559 U.S., not to assess the jurors themselves.  *Id.* at 233.

In this Court, Jacobs argues that (1) the prosecutor's explanation concerning juror Florence's participation in a hung jury is pretextual because the prosecutor did not ask what juror Florence meant when she said the jury "didn't know what to do," (2) the prosecutor's explanation regarding juror Florence's sleeping was pretextual because he did not state that he observed her sleeping while she was in the jury box being questioned, and (3) the prosecutor's explanation concerning juror Florence's subpoena was pretextual because he did not ask follow-up questions about the case.[113]

As discussed above, and as the Louisiana Supreme Court recognized, the prosecutor was not required to ask every conceivable follow-up question. "[A]n honestly mistaken but race-neutral reason" does not violate *Batson*, *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1126 (11th Cir. 2013), because the inquiry is whether the strike was the result of "purposeful

---

[113]    R. Doc. 48 at 30-32.

discrimination." *Rice v. Collins*, 546 U.S. 333, 338 (2006); *see also id.* at 340 (noting that a factual error on prosecutor's part could have been the product of a misstatement, rather than evidence of pretext).  Based on the record, particularly that juror Florence volunteered that "all [of the members of the jury] decided that we didn't know what to do,"[114] the state court trial judge and the Louisiana Supreme Court could have reasonably credited the prosecutor's stated reason that "what concerned me more than anything is . . . [o]n a drug trial if you're stating that no one knows what to do that's not the type of juror that I want on a complicated long second-degree murder case."[115]  The prosecutor could have reasonably believed that a juror's saying that no one knew what to do conveys a lack of understanding of the process, not simply that the jury cannot agree on a verdict.

Further, as to the prosecutor's explanation that he saw juror Florence sleeping, which the Louisiana Supreme Court found compelling, the prosecutor gave a reasonable explanation for his concern about jurors sleeping when they were not being questioned.  He expressly stated that, in his view, the most important time to observe a juror is when they are not being questioned.  The record does not reveal any evidence that would have

---

[114]   St. R. Vol. 50 at 12495.

[115]   *Id.* at 12669.

made it objectively unreasonable for the trial courts to credit the prosecutor's explanation.

Moreover, as the Louisiana Supreme Court stated, the trial judge was not required to state on the record that he also observed juror Florence sleeping. *United States v. Thompson*, 735 F.3d 291, 300 (5th Cir. 2013) ("*Snyder* does not require a district court to make record findings of a juror's demeanor where the prosecutor justifies the strike based on demeanor alone."); *see also Stevens v. Epps*, 618 F.3d 489, 499 (5th Cir. 2010) (finding that state trial judge implicitly credited prosecutor's explanations after explicitly discrediting one, and AEDPA standards bind federal habeas courts with respect to both explicit and implicit fact-finding of the state trial and appellate courts). Because the Court has found that the State courts' findings are supported by the record with respect to the prosecutor's explanations concerning juror Florence's jury service and her sleeping, the Court need not review the credibility of the explanation concerning the subpoena. *See Davis*, 576 U.S. at 275 (noting that the Supreme Court need not consider "the prosecutor's supplementary reason for this strike" because the first reason was supported by the record); *Cook v. LaMarque*, 593 F.3d 810, 824 (9th Cir. 2010) ("Though the unpersuasive justifications are greater in number, the valid reason is overwhelming in substance, and we must consider the

'totality of the relevant facts.'" (quoting *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006)))).  Jacobs has failed to demonstrate by clear and convincing evidence that the Louisiana Supreme Court's determination with respect to juror Florence was unreasonable.

### 5.   *Juror Auzenne*

Juror Auzenne was an African American female.  In the trial court, the prosecutor gave three explanations for striking juror Auzenne: (1) he was puzzled when Auzenne immediately stated that she had never been charged or accused with a crime without being asked; (2) he felt that Auzenne did not make eye contact and was unfriendly towards him, while Auzenne was "all smiles, giggles and laughs" with defense counsel; and (3) Auzenne formerly worked for the Orleans Parish District Attorney's office, and he felt that she may have had experiences there that caused her unfriendly demeanor towards him.[116]  Defense counsel responded that she felt that juror Auzenne "was a quiet person," and that she did not change her demeanor in her responses between the State and the defense.[117]  The trial judge stated that juror Auzenne "seem[ed] to be sort of disinterested," and that he "got the

---

[116]     *Id.* at 12627-28.
[117]     *Id.* at 12672.

impression that [Auzenne] would rather be somewhere else."[118]  The judge further stated that, "other than that[,] . . . [he couldn't] tell [the parties] really whether [he] was observing her during those periods of time as to who was doing the questioning and who wasn't."[119]  The judge concluded, "based on the totality of the circumstances from [his] observations[,] [he] [felt] like [he was] going to deny" the *Batson* challenge.[120]

The Louisiana Supreme Court rejected the Louisiana Fifth Circuit Court of Appeal's negative observations about the trial court's ruling on juror Auzenne—a juror as to whom the court of appeal found no *Batson* violation. The Louisiana Supreme Court clarified that the trial judge was not required to comment specifically on his opinion of the credibility of the prosecutor's demeanor-based explanation, and was not required to comment on whether he observed juror Auzenne's "puzzling" remark, citing *Thaler*, 559 U.S. *Jacobs II*, at 234.  The Supreme Court noted that the trial judge was present when juror Auzenne made the remark.  *Id.*  Finally, the Supreme Court noted that the prosecutor's explanation about the Orleans Parish District Attorney's Office was facially race-neutral, and held that there was no *Batson*

---

[118]   *Id.* at 12674.
[119]   *Id.*
[120]   *Id.*

violation with respect to juror Auzenne in light of the entire voir dire record.
*Id.*

Neither in the state courts nor in this Court has Jacobs offered a comparative juror to juror Auzenne. Jacobs argues that the prosecutor's explanations concerning juror Auzenne are pretextual because (1) that Auzenne used to work in the Orleans Parish District Attorney's Office was an "outlandish" reason for striking her since it suggested she would be a favorable witness for the State, (2) the prosecutor did not ask questions about juror Auzenne's unfriendliness, and (3) juror Auzenne's puzzling comment was not an "outburst" but a product of misunderstanding the question of whether she had been a victim of a crime.[121] Jacobs' arguments concerning the prosecutor's explanations about juror Auzenne's employment and her demeanor mischaracterize the record. The prosecutor's explanation concerning juror Auzenne's employment at the Orleans Parish District Attorney's Office was not "self-evidently pretextual,"[122] because it was not offered in a vacuum. The prosecutor stated that he observed that juror Auzenne had an unfriendly demeanor towards him, and that he did not "know the state of affairs in the Orleans Parish [District Attorney's

---

[121]    R. Doc. 48 at 33-35.
[122]    *Id.* at 34.

Office]."[123]  Taking these pieces of information together "[led him] to believe that she's had some experiences with the DA's office that might make her an unsuitable juror."[124]   This is a reasonable conclusion based on the prosecutor's stated belief that juror Auzenne was noticeably unfriendly towards him and the only connection between them was their shared history of employment at district attorneys' offices.

Moreover, the prosecutor could reasonably have concluded that follow-up questions about juror Auzenne's unfriendliness would be awkward, and would not change his perception of her demeanor. *See Cole v. Roper*, 579 F. Supp. 2d 1246, 1267 (E.D. Mo. 2008) (concluding prosecutor's explanation regarding his supposition about the emotional impact of an event in juror's life was reasonable despite lack of follow-up questions, and noting "[c]ounsel certainly could have asked further questions, but I cannot say that the lack of follow-up questions means the strike was improper."), *aff'd*, 623 F.3d 1183 (8th Cir. 2010), *cert. denied*, 565 U.S. 839 (2011).  As to juror Auzenne's "puzzling" remark, there is no basis on the "cold record" before this Court, *Rice*, 546 U.S. at 343 (Breyer, J., concurring), to credit Jacobs' characterization of the comment rather than the prosecutor's.  *See*

---

[123]   St. R. Vol. 50 at 12628.
[124]   *Id.*

*Davis*, 575 U.S. at 285 (noting that trial judge's statement that he perceived a juror's demeanor differently but that he accepted the prosecutor's explanation did not suggest pretext on federal habeas review, because "[i]t is not at all unusual for individuals to come to different conclusions in attempting to read another person's attitude or mood."). Jacobs has failed to demonstrate by clear and convincing evidence that the Louisiana Supreme Court's conclusion with respect to juror Auzenne was unreasonable.

### 6.   *Juror Jordan*

Juror Jordan was an African American male. In the trial court, the prosecutor offered four explanations for striking juror Jordan: (1) he was concerned that juror Jordan wore short pants to court, which he felt was disrespectful; (2) juror Jordan worked for a casino, where "[t]here are things that occur . . . that are . . . things that law and order type citizens should not possibly get involved in"; (3) juror Jordan stated that he was a victim of an armed robbery, and the prosecutor felt that he harbored resentment towards law enforcement due to the length of time it took police to respond; and (4) juror Jordan had a speech impediment.[125] Defense counsel argued that the prosecutor had not asked sufficient follow-up questions to support the

---

[125]   St. R. Vol. 50 at 12627.

strike for reasons (1) or (2), though defense counsel acknowledged that juror Jordan had been wearing short pants.[126]  Further, defense counsel argued that the prosecutor had accepted other jurors who had been victimized in armed robberies.[127]

The prosecutor responded that it was disrespectful to wear short pants to court, regardless of the explanation the juror would have given for the short pants had he been asked follow-up questions.[128]  The prosecutor also distinguished other victims of armed robberies, stating that one juror mentioned by defense counsel had pulled a gun on the robber, and that no other victim of crime had volunteered that it took the police two hours to arrive on the scene.[129]  Finally, the prosecutor reiterated that juror Jordan appeared to have a speech impediment that would make it difficult for him to communicate with the rest of the jury, and stated that he did not ask follow-up questions about the impediment because he did not want to embarrass juror Jordan.[130]

The trial judge stated that he did not notice the short pants, that he noticed that juror Jordan had a "shyness or a reluctance to answer questions"

---

[126]   *Id.* at 12658.
[127]   *Id.* at 12659-61.
[128]   *Id.* at 12662-63.
[129]   *Id.* at 12661-62.
[130]   *Id.* at 12664.

that might have been a speech impediment, and that juror Jordan had volunteered that it took police two hours to arrive on the scene of his robbery.[131]  The trial judge noted, "[i]t did seem like he was just perturbed by the whole situation."[132]   Finally, the trial judge rejected the *Batson* challenge.[133]

As with juror Auzenne, the Louisiana Supreme Court rejected the Louisiana Fifth Circuit's criticism of the trial court's handling of the *Batson* challenge with respect to juror Jordan—a juror as to whom the court of appeals found no *Batson* violation.  The Louisiana Supreme Court found that the trial judge properly denied the *Batson* challenge and noted that the prosecutor did not have to ask follow-up questions to support the strike based on the explanation that juror Jordan worked in a casino because the prosecutor's problem was with juror Jordan's employment at a casino generally.  *Jacobs II*, 32 So. 3d at 235.  The court reasoned that no amount of follow-up would change the fact that he worked in a casino, and the prosecutor's concern about jurors who worked at casinos was race-neutral.  *Id.*  Further, the Louisiana Supreme Court found that the prosecutor's explanations concerning juror Jordan's potential speech impediment and his

---

[131]     *Id.* at 12664-65.
[132]     *Id.* at 12665.
[133]     *Id.*

demeanor when describing police's late response when he was the victim of a crime were supported by the record. *Id.* at 234. Finally, the Supreme Court noted that the trial judge could properly accept the prosecutor's explanation concerning the short pants without stating findings concerning the pants on the record. *Id.* at 235.

In this Court, Jacobs argues that the prosecutor's explanations were pretextual because (1) the prosecutor did not ask follow-up questions about juror Jordan's employment at the casino, (2) he did not ask follow-up questions about juror Jordan's short pants, (3) the State accepted other jurors who were victims of armed robberies, and (4) the supposed speech impediment did not interfere with juror Jordan's ability to communicate during voir dire.[134] The Louisiana Supreme Court reasonably concluded that the prosecutor was not required to ask follow-up questions concerning his explanations for the strike. The prosecutor clearly explained why he felt that juror Jordan's short pants were disrespectful regardless of any explanation he might give for wearing them, and the prosecutor's explanation concerning the casino was based on his general concern about "things that occur" in casinos, not things that juror Jordan personally did at the casino. The trial judge could reasonably have concluded, as the Louisiana Supreme Court

---

[134]    R. Doc. 48 at 35-37.

found, that the prosecutor generally had a concern about people who spend considerable time at casinos. As to Jacobs' argument that other prospective jurors had been the victim of armed robberies, the prosecutor clearly explained that he was not striking juror Jordan because he was the victim of an armed robbery, but because juror Jordan's demeanor suggested that he was upset by the two-hour delay in the police response. Finally, as to Jacobs' argument concerning the speech impediment, once again, there is no basis on the cold transcript alone to conclude that juror Jordan's apparent speech impediment did not impede his communication during voir dire when the trial judge specifically commented that he had a "shyness or . . . a public speaking type of thing" that "could have been a speech impediment."[135] Jacobs has not demonstrated by clear and convincing evidence that the Louisiana Supreme Court's conclusion with respect to juror Jordan was unreasonable.

### 7. *Juror Stevenson*

Juror Stevenson was an African American female. In the trial court, the prosecutor offered four reasons for striking juror Stevenson: (1) she slept during the first jury panel while she was seated as a member of the venire

---

[135]    St. R. Vol. 50 at 12665.

audience; (2) she taught Sunday School and "gave the impression that she was an extremely forgiving soul"; (3) she had two nephews in jail whom the prosecutor believed were prosecuted in Jefferson Parish by his office; and (4) she voted for a plaintiff in a civil case in which the defendant received a judgment, which the prosecutor felt indicated a "type of decision making . . . attributed to people who have liberal bends . . . and . . . a forgiving soul."[136] First, defense counsel argued that multiple jurors had been sleeping during voir dire.[137]   Second, she argued that the State had previously accepted a white juror, juror Orillion, who said she spent her free time doing church work.[138]   Third, she argued that the prosecutor did not ask sufficient follow-up questions concerning juror Stevenson's perspective on her nephew's being in jail.[139]   Finally, defense counsel argued that the State had accepted another white juror, juror Winstead, who had voted for a plaintiff in a civil trial.  Defense counsel responded that he did not think other jurors had been sleeping, that juror Orillion was different from juror Stevenson because juror Orillion had voted guilty in a criminal jury trial she had participated in, and that the prosecutor's concerns about juror Stevenson's family members in

---

[136]     *Id.* at 12623-24.
[137]     *Id.* at 12648.
[138]     *Id.* at 12647-48.
[139]     *Id.* at 12650.

jail arose specifically because he felt that his office put them there.[140]   The trial judge stated, "[t]he Court accepts the State's race neutral reasons and finds that the defendant has not carried its [sic] burden of showing purposeful discrimination."[141]

The Louisiana Supreme Court again rejected the Louisiana Fifth Circuit's negative comments about the trial court's ruling with respect to juror Stevenson—a juror as to whom it found no *Batson* violation.   The Louisiana Supreme Court found that the trial judge properly accepted the prosecutor's race-neutral explanations and highlighted the distinction the prosecutor made between jurors Stevenson and Orillion.   *Jacobs II*, at 235. The Supreme Court found "[e]ven more compelling" that the prosecutor had observed juror Stevenson sleeping, while the prosecutor had not observed juror Orillion sleeping.   *Id.*   The Supreme Court ultimately found that the trial judge had properly determined that the prosecution did not strike juror Stevenson for a racially discriminatory reason.   *Id.*

In this Court, Jacobs argues that the prosecutor's explanations for striking juror Stevenson were pretextual because (1) other jurors had closed their eyes during the voir dire, and the trial judge did not explicitly state that

---

[140]     *Id.* at 12653-54.
[141]     *Id.* at 12654.

he saw juror Stevenson sleeping; (2) the explanation concerning Sunday School was pretextual because the State also struck juror Jordan because he worked at a casino, "creating a no-win scenario for prospective Black jurors;" (3) he did not ask follow-up questions about how juror Stevenson's family members' incarceration would impact her decision-making; and (4) he did not ask follow-up questions about juror Stevenson's jury service.[142]   As discussed above, and as the Louisiana Supreme Court noted, the trial judge was free to accept the prosecutor's explanation regarding juror Stevenson's being asleep without commenting on it for the record.   Further, defense counsel made the argument that other jurors had closed their eyes during voir dire before the trial judge, and he nevertheless found the prosecutor's explanation credible.   There is nothing in the record to suggest that this was unreasonable on the trial judge's part, particularly considering that closing one's eyes, as defense counsel claimed other jurors had done, is not necessarily the same as sleeping, as the prosecutor stated juror Stevenson had been.   As to Jacobs' argument concerning the explanation about juror Stevenson's service as a Sunday School teacher, there is nothing inherently suspect about the prosecutor's articulating two different rationales for striking different jurors based on completely distinct activities.   Since a Black

---

[142]     R. Doc. 48 at 37-38.

juror ultimately served on the jury, this does not create a "no-win scenario for prospective Black jurors," but simply suggests that the prosecutor preferred not to have two differently situated jurors on the jury for different reasons.

As to Jacobs' arguments concerning the failure to ask follow-up questions, "the exercise of a peremptory challenge can rest upon instinct not reason." *Rice*, 546 U.S. at 343 (Breyer, J., concurring).  With respect to juror Stevenson's incarcerated family members, the prosecutor stated that he was concerned because his office prosecuted juror Stevenson's nephews.  The prosecutor could reasonably have concluded that directly asking juror Stevenson whether this would affect her ability to be impartial would be fruitless.  *See Lamon*, 467 F.3d at 1102 (noting that prosecutor's failure to ask was not evidence of pretext because the trial judge could have credited the prosecutor's "honest, even if possibly mistaken, belief that [the juror] would not have answered additional questions honestly"); *see also Felkner v. Jackson*, 562 U.S. 594, 595 (2011) (per curiam) (finding that petitioner was not entitled to federal habeas relief on *Batson* claim and noting prosecutor's statement that juror's potential prejudice was "not something [he] wanted to roll the dice with").

Similarly, as to the prosecutor's explanation concerning juror Stevenson's decision to vote for the plaintiff in a civil case, follow-up questions would not have been necessary. The prosecutor knew that juror Stevenson voted for the plaintiff and knew that the jury ultimately decided in favor of the defendant, and concluded that these two facts gave rise to an inference that juror Stevenson had a "liberal bend" and a "forgiving soul." The issue before this Court is whether the Louisiana Supreme Court "had no permissible alternative but to reject the prosecutor's race-neutral justifications and conclude [Jacobs] had shown a *Batson* violation." *Rice*, 546 U.S. at 341. No evidence suggests that the trial judge could not have believed that the prosecutor honestly believed this line of reasoning. Accordingly, no evidence demonstrates that the Louisiana Supreme Court was unreasonable in affirming the trial judge's acceptance of this explanation. Jacobs has not demonstrated by clear and convincing evidence that the Louisiana Supreme Court's conclusion with respect to juror Stevenson was unreasonable.

### 8. *Juror Knight*

In Jacobs' objections, he contends that the State's opposition to a challenge for cause to prospective juror Knight, who did not serve on the jury

because he was peremptorily struck by the defense,[143] illustrates that the State was not concerned about whether the trial was fair to Jacobs, and thus renders suspect any explanation for striking a juror offered by the State that depends on protecting Jacobs' rights.[144]  During a break in the first day's voir dire session, juror Knight asked to approach the bench to discuss his involvement in an organization called the Sons of Confederate Veterans.  He began, "[i]t does not present a problem to me if I'm selected to be a juror, but . . . I certainly wouldn't want something overturned on a basis like that, an occasion being made after the fact, so that's the main purpose in bringing it up at this time."[145]  When defense counsel heard about juror Knight's membership, she asked, "why would that be a problem?"[146]  Juror Knight responded, "some people perceive the organization to be racist . . . I don't think there's any legitimacy in the claim, but I just didn't want anything overturned."[147]  Defense counsel engaged in extensive questioning of juror Knight, concerning the extent of his involvement in the organization and his perception of the organization's purpose.[148]  Juror Knight explained that the

---

[143]     St. R. Vol. 49 at 12475.
[144]     R. Doc. 48 at 21-22.
[145]     St. R. Vol. 49 at 12307.
[146]     *Id.* at 12308.
[147]     *Id.*
[148]     *Id.* at 12308-36.

organization has Black members, because the only criterion for membership is an ancestral connection to somewhat who fought for the Confederacy during the Civil War, that the organization has historical and political goals, and that the political goals concern the right to fly the Confederate flag.[149]

Specifically, juror Knight stated that his primary reason for joining the organization was to advocate for the right to fly the Confederate flag at the state capitol building in South Carolina.[150]  Juror Knight stated that he felt that the NAACP, which he referred to as a "clique," was "pushing their political muscle to achieve political goals," which he "did not feel . . . was right."[151]  He explained, "their perception is that the confederate flag in any form is a racist symbol and in my context I don't see it that way."[152]

Defense counsel later challenged juror Knight for cause on the basis of this colloquy.[153]  The prosecutor opposed the challenge, stating, "[h]e . . . said at some point there are Black members of this organization and he did state that he could be fair and impartial and he did state that he would listen to the testimony, and . . . he came forward because this organization has been getting some bad press . . . He was honest.  He explained his position and he

---

[149]    *Id.*
[150]    *Id.* at 12312.
[151]    *Id.* at 12314.
[152]    *Id.*
[153]    *Id.* at 12468-69.

can be fair and forthright."[154]  The trial judge denied the challenge for cause without stated reasons.[155]

On direct appeal, Jacobs assigned error to the trial court's denial of this challenge for cause.  The Louisiana Fifth Circuit reviewed the trial transcript, and noted that, based on state caselaw, "[m]ere membership in or affiliation with an organization is not a ground for a challenge for cause where the voir dire as a whole shows the juror can render an impartial verdict according to the law and evidence."  *Jacobs*, 67 So. 3d at 560 (citing *State v. Manning*, 885 So. 2d 1044, 1078-79 (La. 2004), *cert. denied*, 544 U.S. 967 (2005); *State v. Isaac*, 260 So. 2d 302, 304 (La. 1972); *State v. Dunn*, 109 So. 56, 62 (La. 1926), *cert. denied*, 273 U.S. 656 (1927)).  The court concluded that the record supported the trial judge's conclusion that the record as a whole showed that the juror could render an impartial verdict, but did not discuss the prosecutor's opposition to the strike.  *Id.* at 560-61.

The Court has reviewed the voir dire transcript, and concludes that Jacobs' characterization of the prosecutor's argument as "vehement[] opposi[tion]" is not supported by the record.  While the cold transcript alone does not reveal the prosecutor's demeanor during the challenge for cause,

---

154     *Id.* at 12469-70.
155     *Id.* at 1270.

the record reflects that the prosecutor used reasonable arguments and did not use heated or inflammatory language.  Juror Knight repeatedly asserted that he joined the organization because he felt that it was important to his cultural heritage to fly the Confederate flag, that he did not feel that the flag was a racist symbol or that the Sons of the Confederacy was a racist organization, and that his association with the organization would not affect his ability to serve on the jury.  Irrespective of the accuracy of juror Knight's perspective on the Confederate flag, the prosecutor could have honestly believed that Knight could be an impartial and fair juror in light of his responses in his colloquy with defense counsel.  The Court finds that the prosecutor's opposition to the challenge for cause of juror Knight does not give rise to an inference of racially discriminatory motivation in the prosecutor's use of peremptory challenges.

Considering the historical evidence of discrimination proffered by Jacobs, in conjunction with the statistical pattern of strikes in the case and the comparative juror analyses performed by Magistrate Judge Currault, the state courts, and Jacobs, the Court finds that Jacobs has not demonstrated by clear and convincing evidence that the state courts' findings of fact at

*Batson*'s third step were unreasonable.  Accordingly, the Court overrules Jacobs' objections to the R&R on the *Batson* claim.

### B.    Judicial Bias

In Jacobs' amended petition, he asserts that two Louisiana Supreme Court justices' decisions not to recuse themselves from his case when that court reversed the Louisiana Fifth Circuit's order granting Jacobs a new trial violated his due process right by creating an unconstitutional risk of bias.[156] He contends that then Associate Justice Knoll should have recused because she had a familial relationship with a prosecutor who worked in the Jefferson Parish District Attorney's Office during Jacobs' first trial,[157] and then Associate Justice Guidry should have recused because, as a trial judge, he denied a *Batson* motion by a defendant in an unrelated trial and made findings concerning the Black Strikes report.[158]

In the last reasoned decision from the state courts on the issue, the Louisiana Supreme Court rejected Jacobs' claims, holding that Associate Justice Knoll was not required to recuse because the prosecutor with whom she had a familial connection had left the District Attorney's Office before

---

[156]    R. Doc. 25 at 34-37.
[157]    R. Doc. 48 at 39-40.
[158]    *Id.* at 40.

Jacobs' re-indictment, and Associate Justice Guidry was not required to recuse because the Black Strikes report was not before the Supreme Court when it considered Jacobs' appeal. *Jacobs*, 37 So. 3d at 994-96.

The R&R concluded that Jacobs failed to demonstrate that the Louisiana Supreme Court's decision to allow these justices to preside over Jacobs' case was contrary to or an unreasonable application of federal law, or that the Louisiana Supreme Court's underlying factual findings were clearly erroneous.[159]  In his objections, Jacobs contends that the R&R mistakenly recommends dismissal of Jacobs' claim as raising only issues of state law.[160]  But the R&R fairly analyzes the federal constitutional ramifications of each justice's decision to refrain from recusal under the standards set by the AEDPA.[161]  The Court considers *de novo* Jacobs' claim below.

Under Supreme Court jurisprudence, to determine whether a risk of bias violates a defendant's right to due process, the Court "asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias.'"  *Williams v.*

---

[159]    R. Doc. 43 at 63-64.
[160]    R. Doc. 48 at 39.
[161]    R. Doc. 43 at 58-64.

*Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 881 (2009)).  "[M]atters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion," and do not present cognizable due process claims.  *Caperton*, 556 U.S. at 876.  Further, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and "opinions formed by the judge on the basis of . . . events occurring in . . . prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).

Here, with respect to Associate Justice Knoll, Jacobs points only to a remote "matter of kinship."  *See Caperton*, 556 U.S. at 876.  As the R&R correctly notes, and Jacobs concedes, Associate Justice Knoll's family member left the District Attorney's Office before the beginning of Jacobs' second trial,[162] so even if this relationship could have created an unconstitutional risk of bias in the first trial, there is no basis to conclude that Justice Knoll's evaluation of Jacobs' appeal after his second trial was tainted by any unconstitutional risk of bias.  With respect to Associate Justice Guidry, his prior findings with respect to the Black Strikes report merely

---

[162]    *Id.* at 40; R. Doc. 43 at 61.

constituted a judicial ruling, and Jacobs presents no evidence that the ruling stemmed from "deep-seated favoritism or antagonism" on Justice Guidry's part, as would be required to demonstrate an unconstitutional risk of bias. *See Liteky*, 510 U.S. at 555. Thus, regardless of whether the Black Strikes report was actually before the Louisiana Supreme Court, there is no evidence in the record that would show that Justice Guidry was subject to an unconstitutional risk of bias. The Court overrules Jacobs' objections to the R&R's finding that he is not entitled to relief on his claim of being subject to an unconstitutional risk of bias.

## C.    Choice of Counsel

In Jacobs' amended petition, he contends that the trial court deprived him of the right to counsel of his choice when it disqualified G. Ben Cohen from representing him.[163]  The trial court disqualified Cohen after a hearing on a motion to traverse his qualifications or, in the alternative, to disqualify him, at which the defense and the State presented argument.[164]  In the last reasoned decision on the issue, the Louisiana Fifth Circuit, on remand, first noted that "[t]he record does not reflect that defendant sought to have Mr.

---

[163]    R. Doc. 25 at 38-41.
[164]    St. R. Vol. 54 at 13628.

Cohen reinstated as defense counsel after the case was no longer a capital case," and that, as a result, the court did "not see an appealable issue." *Jacobs*, 67 So.3d at 565. In the alternative and on the merits, the Louisiana Fifth Circuit held that, "[Jacobs], who was indigent, did not have the constitutional right to choose his appointed counsel." *Id.*

The R&R found that because Jacobs proceeded as an indigent, he was not entitled to counsel of his choice, but even if he were entitled to counsel of choice, he would not be entitled to federal habeas relief on this claim because a defendant's right to counsel of choice is limited to qualified and effective counsel.[165] While the state record reflects that Jacobs was proceeding as an indigent with appointed counsel during his re-trial, Jacobs contends that he was entitled to maintain Cohen on his defense team because Cohen was representing him pro bono.[166] Jacobs objects to the R&R's finding that Cohen was not qualified counsel within the meaning of the Sixth Amendment because he argues that Louisiana's capital qualification rules apply only to appointed counsel for indigents.[167] According to Jacobs,

---

[165]    R. Doc. 43 at 68.
[166]    R. Doc. 48 at 41.
[167]    *Id.*

because Cohen was representing him pro bono, Cohen was not subject to any capital qualification rules.[168]

Under Supreme Court jurisprudence, "an indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice." *Luis v. United States*, 578 U.S. 5, 11 (2016). Defendants "who do[] not require appointed counsel" have a right to "choose who will represent [them]." *United States v. Gonzalez*, 548 U.S. 140, 144 (2006). But this right to counsel of choice is "circumscribed in several important respects." *Id.* Of relevance here, the right extends only to a defendant's right "to be represented by an otherwise qualified attorney." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 625 (1989). The question of whether a defendant was unconstitutionally deprived of his Sixth Amendment right to counsel of choice is a mixed question of law and fact. *See South v. Maass*, 958 F.2d 378, 378 (9th Cir. 1992).

The record reflects, the R&R notes, and no party contests, that Jacobs was proceeding as an indigent during his second trial in 2006. Jacobs contends that the following statement made by Cohen at the hearing on the State's motion to disqualify him demonstrates that he was representing Jacobs pro bono: "I work for an organization called the Capital Appeals

---

[168]    *Id.*

Project and I'm staying on [Jacobs'] case so he's not subject to death sentence."[169]   But in the same hearing, Cohen repeatedly referred to appointed co-counsel, and acknowledged that he was an appellate attorney who was not certified to represent an indigent defendant in a capital case.[170] While the transcript of the hearing before the trial court reflects that Cohen objected to his disqualification, he admitted multiple times that he was not qualified to serve as lead counsel or as second chair in a capital case.  Jacobs' counsel never argued before the trial court that Cohen was entitled to remain on Jacobs' case because he was representing Jacobs pro bono rather than as appointed counsel.

In a similar case, the Louisiana Supreme Court held that a defendant's counsel was appointed, even though the defendant contended on appeal that his counsel, through the Capital Defense Project, had agreed to represent him pro bono.  The Louisiana Supreme Court noted that this situation arose because of a complicated indigent defense structure in Louisiana before the

---

[169]   St. R. Vol. 54 at 13621.

[170]   *See id.* at 13615 ("I'm a certified appellate counsel and that's the extent of my certification."); *id.* at 13616-19 (referring to a Ms. Lehman, appointed third chair in the case, and a "Clive Stafford Smith," appointed and "coming back to try the case"); *id.* at 13628 ("I do not mean to equivocate. I have not sought and I am not certified first chair. I have not sought and I am not certified second chair. I am an appellate lawyer.").

adoption of the Louisiana Public Defender Act of 2007. *State v. Reeves*, 11 So. 3d 1031, 1059 (La. 2009), *cert. denied sub nom. Reeves v. Louisiana*, 558 U.S. 1031 (2009). Under this system, "[t]he Capital Defense Project was a part of the regional capital defense program created and funded by [the Louisiana Indigent Defense Assistance Board ('LIDAB').]" *Id.* The court found that "[u]nder the unique and exceptional circumstances of the interplay between the local and regional indigent defense system, the nature of [defendant's] representation . . . was characteristic of appointed counsel," because "although not a part of the local Public Defender's Office, the Capital Defense Project, funded through LIDAB, was another arm of the indigent defense system funded by the state." *Id.* at 1061-62. Jacobs has not introduced evidence demonstrating by clear and convincing evidence that the state courts' conclusion that Cohen served as appointed counsel was unreasonable, and has not demonstrated that the state courts unreasonably applied federal law in concluding that Jacobs did not have a Sixth Amendment right to representation by Cohen. Accordingly, the Court overrules Jacobs' objections to the R&R on his Sixth Amendment right to counsel of choice claim.

**D.   Infected Indictment**

Jacobs contends that he went to trial on a defective indictment tainted by unconstitutional racial discrimination because, while he was re-indicted before his re-trial in 2002, the jury in his trial was sworn in with the 1996 indictment, altered by hand to reflect the charges in the amended 2002 indictment.[171]  This claim fails because it is both procedurally barred and not cognizable by a federal court sitting in habeas.

First, Jacobs failed to raise this issue in the trial court.  He first pressed this argument in supplemental briefing on direct appeal to the Louisiana Fifth Circuit Court of Appeal.  That Court noted that, "to the extent that [Jacobs] challenges his indictment on any basis that has not been raised in the trial court, there is no ruling for this Court to review." *Jacobs*, 67 So. 3d at 598 (citing U.R.C.A. 1-3).  As noted above, U.R.C.A. 1-3 is an independent and adequate state ground that bars federal court review under the AEDPA. The record reflects that Jacobs did not object to the reading of the indictment at his second trial, nor did he file a timely motion to quash the 2002 indictment, even after its amendment to reflect the charges of second degree murder rather than first degree murder.  Thus, Jacobs' claim is procedurally barred.

---

[171]    R. Doc. 25 at 41-45.

Jacobs nevertheless contends that he should be excused from the procedural default because the failure to recognize the error led to an additional conviction for Jacobs and served no strategic purpose, constituting ineffective assistance of counsel.[172]  Jacobs may overcome the state procedural bar by "proving ineffective assistance of counsel in violation of the Sixth Amendment of the Constitution" and demonstrating that this resulted in actual prejudice.  *Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003).  To prove ineffective assistance of counsel, Jacobs must show that his "counsel's representation fell below an objective standard of reasonableness" and that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 & 694 (1984)). Jacobs cannot establish either prong because he has not shown a defect in the indictment.  First, he and his counsel had clear notice that he was charged with two counts of murder.  Jacobs was convicted of both murders after his first trial, and the 2002 indictment clearly charged Jacobs with the murders of both victims.  *See State v. Seals*, 83 So. 3d 285, 352 (La. App. 5 Cir. 2011) ("In a case such as this one, where the charge is reduced from first degree murder to second degree murder, defendant cannot complain of lack of

---

[172]     R. Doc. 48 at 43-44.

notice, since the charge of second degree murder does not change the notice as to the crime charged.").  Second, the sole act of reading the incorrect piece of paper did not revive the original indictment; Jacobs was tried after re-indictment by a grand jury empaneled in accordance with the state statutory structure on the selection of grand juries adopted in 1999 to eliminate racial discrimination in grand jury selection.[173]  *See id.* at 351 ("[A] superseding indictment implicitly dismisses a first indictment.").  Jacobs does not argue and offers no evidence to show that the 2002 indictment was tainted by racial discrimination.  Thus, Jacobs cannot overcome the procedural bar to his claim regarding alleged defects in the indictment.  *United States v. Okoli*, 106 F.3d 397, 397 (5th Cir. 1997) (per curiam) (rejecting ineffective assistance of counsel claim for failure to challenge indictment when alleged defect in the indictment was not present).

Second, even if the claim were not procedurally defaulted, "the sufficiency of a state indictment is not a matter of federal habeas relief unless it can be shown that the state indictment is so defective that it deprives the state court of jurisdiction."  *Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir. 2007) (quoting *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994)).  Moreover, when "the sufficiency of the indictment was squarely presented to

---

[173]    R. Doc. 43 at 4.

the highest court of the state on appeal, and that court held that the trial court had jurisdiction over the case," federal habeas review of the sufficiency of the indictment is foreclosed. *Id.* (quoting *Millard v. Lynaugh*, 810 F.2d 1403, 1407 (5th Cir. 1987)). While the Louisiana Fifth Circuit noted that Jacobs' argument concerning defects in the indictment was not properly before the court because of Jacobs' failure to raise the issue in the trial court, the court nevertheless assessed the merits of the claim and found the indictment sufficient. *Jacobs*, 67 So. 3d at 549-50. Jacobs presented this issue to the Louisiana Supreme Court on his second petition, and that court denied review. *State v. Jacobs*, 80 So.3d 468 (La. 2012). Thus, this claim is foreclosed on the ground that the state courts have definitively decided the issue and found that the indictment conferred jurisdiction on the trial court. The Court overrules Jacobs' objection to the R&R's finding that he is not entitled to relief on his claim regarding the allegedly defective indictment.

### E.    Admission of Jacobs' Custodial Statement

In Jacobs' amended habeas petition, he asserts that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by admitting a custodial statement when Jacobs had not knowingly, intelligently, or

voluntarily waived his right to remain silent.[174]  Jacobs contended that

because he was only sixteen years old at the time of the statement, suffered

from brain dysfunction, and did not understand that he was being charged

with murder, he could not have understood his rights.[175]  Further, he

contends that Lieutenant Pernia-Snow misrepresented herself and promised

that she would tell the trial judge that she thought Jacobs was innocent.[176]

The trial court denied a motion to suppress the statement in July 2005 after

an evidentiary hearing that included expert testimony from a licensed

psychologist who testified that Jacobs suffered from a brain dysfunction and

would not likely have understood his rights.[177]  The Louisiana Fifth Circuit

affirmed the trial court's decision to admit the statement in October 2005.[178]

The last reasoned decision on the issue came when the Louisiana Fifth

Circuit, on remand, addressed Jacobs' remaining assignments of error on

direct review of his conviction and sentence.  In that opinion, the court

discussed at length the testimony of each individual at the evidentiary

hearing held on the motion to suppress, and found the trial court's

---

[174]    R. Doc. 25 at 48-54.

[175]    *Id.* at 48-49.

[176]    *Id.* at 49-50.

[177]    R. Doc. 43 at 83-84.

[178]    *Id.* at 79.

conclusion that the statement was knowingly, intelligently, and voluntarily given was supported by evidence. *Jacobs*, 67 So. 3d at 581-84.

The R&R found that Jacobs failed to demonstrate that the statement was the result of unconstitutional influence, coercion, or promise, and that Jacobs failed to present clear and convincing evidence that the state courts' factual findings as to whether Jacobs' waiver of his right to remain silent was knowingly, intelligently, and voluntarily given were unreasonable, particularly in light of the AEDPA's presumption of correctness.[179]  Jacobs objects first that Lieutenant  Pernia-Snow did in fact procure Jacobs' statement with deception, and second that the state courts erred in discounting the testimony of the psychologist offered in the evidentiary hearing on the motion to suppress.[180]

Statements made by an individual held in custody are inadmissible unless that person has been warned that that he or she has a right to remain silent and has affirmatively waived that right. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).   The individual's waiver must be knowingly, intelligently, and voluntarily given, and cannot be the result of intimidation, coercion, or deception. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

---

[179]    *Id.* at 84.
[180]    R. Doc. 48 at 43.

A defendant's mental condition, "by itself and apart from its relation to official coercion, should" not dispose of the inquiry into constitutional voluntariness. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). The question of whether an individual's waiver was knowing, voluntary, and intelligent is a mixed question of law and fact, and the state courts' determination of factual issues in deciding whether a waiver is voluntary is entitled to the presumption of correctness. *Gachot v. Stalder*, 298 F.3d 414, 418 (5th Cir. 2002).

Here, as the R&R notes, the state courts exhaustively and repeatedly considered the testimony adduced at the evidentiary hearing, resolved conflicts in the testimony based on the perceived credibility of the witnesses, and on the basis of the testimony, concluded that Jacobs' statement was voluntarily, intelligently, and knowingly given.[181]  Jacobs offers no evidence to demonstrate that the underlying factual findings were erroneous aside from the testimony already considered by the state courts.  The Court finds that Jacobs fails to present any justification for reweighing the testimony introduced in the trial court. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("[The federal habeas statute] gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed

---

[181]    *Id.* at 82-84.

by the state trial court, but not by them."). Similarly, Jacobs' argument that the trial court improperly weighed the testimony of the psychologist because it was not opposed by testimony from an expert retained by the Government is without merit. Any mental condition allegedly suffered by Jacobs would not, on its own, render his statement involuntary. *See Connelly*, 479 U.S. at 164. Thus, the testimony of the psychologist was offered to illustrate one aspect of the totality of the circumstances surrounding Jacobs' statement, and the trial court was free to assign as much weight to that testimony as it saw fit. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979))). Further, the absence of countervailing testimony from a Government expert did not foreclose the trial court from determining the weight of the psychologist's testimony. *Normand v. Cox Commc'ns La., LLC*, 167 So. 3d 156, 163 (La. App. 5 Cir. 2014) ("The trial court may accept or reject uncontradicted opinions expressed by an expert as to ultimate facts, based upon the other evidence that the trial court admits."), *writ denied*, 163 So. 3d 815 (La. 2015); *accord Jenkins v. Gen. Motors Corp.*, 446 F.2d 377, 380 (5th Cir. 1971) ("The jury

was not bound by the appellant's evidence, nor forced to accept the testimony of its experts, even if uncontradicted."); Paul Coltoff, et al., 31A Am. Jur. 2d Expert and Opinion Evidence § 129 (May 2024 Update) ("[A] trial court is entitled to reject apparently unrebutted testimony of a defense mental health expert if the trial court finds that the facts do not support the testimony."). Accordingly, the Court finds that Jacobs has failed to demonstrate that the state courts unreasonably applied federal law, or that the state courts' factual determinations underlying the admission of his custodial statements were unreasonable.  Jacobs' objections to the R&R's findings on this claim are overruled.

### F.    Inconsistent Theories

In Jacobs' amended habeas petition, he asserts that the trial court violated his Constitutional rights to due process and a fair trial under the Fourteenth Amendment by prohibiting Jacobs from introducing prosecutors' arguments from the separate trial of his co-defendant Roy Bridgewater into evidence.[182]  In the last reasoned decision on the issue, the Louisiana Fifth Circuit declined to rule on the merits of the assignment of error as "law of the case," since the issue had been thoroughly litigated in

---

[182]    R. Doc. 25 at 54-57.

pretrial motions and appellate writs. *Jacobs*, 67 So. 3d at 578. In the alternative, the Louisiana Fifth Circuit stated that if it were to reach the merits, it would find no error, because prosecutors' arguments are not evidence, the prosecutors' arguments in Bridgewater's and Jacobs' cases were not inconsistent, and their theories of the cases remained the same. *Id.* at 578-79.

The R&R recommends dismissal of this claim because, first, claims regarding state courts' evidentiary rulings are generally not cognizable on federal habeas review because state law governs the admission of evidence in state trials, citing *Jones v. Cain*, 600 F.3d 527, 536 (5th Cir. 2010); second, no clearly established rule of federal law entitles a defendant to present evidence of inconsistent theories or prohibits prosecutors from presenting inconsistent theories; and third, the Louisiana Fifth Circuit's conclusion that the prosecution's theories were not inconsistent was not unreasonable.[183] Jacobs objects to the R&R's finding that no clearly established federal law entitles a defendant to present evidence of inconsistent theories, citing the following statement in Justice Thomas' concurrence in *Bradshaw v. Stumpf*:

> The Bill of Rights guarantees vigorous adversarial testing of guilt and innocence and conviction only by proof beyond a reasonable doubt. These guarantees are more than sufficient to deter the State from taking inconsistent positions; a prosecutor who

---

[183]   R. Doc. 43 at 85-92.

> argues inconsistently risks undermining his case, for opposing
> counsel will bring the conflict to the factfinder's attention.

545 U.S. 175, 187 (2005).   Jacobs relied on the same statement in his amended petition.[184]   Nevertheless, as Magistrate Judge Currault notes, the Supreme Court has explicitly held that "clearly established federal law" refers "only [to] the holdings . . . of this Court's decisions."[185]   *White v. Woodall*, 572 U.S. 415, 419 (2014) (citations omitted).   The statement Jacobs relies on is not essential to the Supreme Court's holding, and is not part of the majority opinion.   Thus, it does not constitute clearly established federal law.   Moreover, even if it were clearly established federal law, the statement does not create or imply any right by a defendant to present evidence of inconsistent theories, it simply acknowledges that a prosecutor "risks undermining his case" by offering them.   Finally, the record reflects that the Louisiana Fifth Circuit's conclusion that there was no inconsistency in the State's theories in the two cases was reasonable, because in each case, the State argued that "either one of [Jacobs or Bridgewater] (or both of them) could have been the shooter," but each should be found guilty of murder

---

[184]    R. Doc. 25 at 57.
[185]    R. Doc. 43 at 91.

"under the law of principals." *Jacobs*, 67 So. 3d 579.  Accordingly, Jacobs'
objection on the inconsistent theories claim is overruled.

### G.    Evidentiary Rulings

In Jacobs' amended habeas petition, Jacobs asserts that several of the
trial court's evidentiary rulings violated his rights to due process under the
Fourteenth Amendment, including the trial court's exclusion of the expert
testimony of Dr. Fred Sautter concerning Roy Bridgewater's psychological
state, the trial court's admission of expert ballistics testimony by Louise
Walzer, and the trial court's admission of certain gruesome photographs.[186]
In the last reasoned decision on the trial court's evidentiary rulings, the
Louisiana Fifth Circuit concluded that the trial court properly excluded Dr.
Sautter's testimony because the testimony would have been irrelevant, and
would have been impermissible testimony on an ultimate legal issue. *Jacobs*,
67 So.3d at 580-81.  Specifically, the court noted that Dr. Sautter would have
testified concerning "*Bridgewater's* mental health issues to show
*defendant's* state of mind," and that Dr. Sautter never examined Jacobs.  *Id.*
(emphasis in original).  Moreover, the Louisiana Fifth Circuit concluded that
"the defense would have sought to elicit impermissible testimony going to

---

[186]    R. Doc. 25 at 60-65.

the legal question of defendant's guilt or innocence" based on the defense's description of the intended testimony.  *Id.* at 581.

The Louisiana Fifth Circuit declined to review the trial court's admission of Walzer's testimony as "law of the case" due to extensive pretrial litigation concerning the testimony's admissibility.  *Id.* at 586.  In the alternative, the Louisiana Fifth Circuit stated that even if it were to review the assignment of error, it would find Jacobs' argument meritless.  Id.  The court reviewed the state law on the admissibility of expert evidence and the trial court's gatekeeping function based on the incorporation of the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 504 U.S. 579 (1993), standards into state evidentiary law.  *Id.* at 586-87.  Finally, the court stated that "all of the Daubert criteria were satisfied with regard to Ms. Walzer's testimony."  *Id.* at 587.  Specifically, the court noted that Walzer "testified that the work she does at the crime lab is subject to peer review," that "she follows the [relevant professional] guidelines," and that "[i]t was clear from Ms. Walzer's testimony that the methods used in the Jefferson Parish crime lab are those widely accepted in her profession."  *Id.*

As to the photographs, the Louisiana Fifth Circuit concluded that the trial court properly admitted them under state law because they were not "so gruesome as to overwhelm the jurors' reason and lead them to convict the

defendant without sufficient evidence." *Id.* at 568.  The court noted that there was sufficient evidence on the trial record to convict Jacobs.  *Id.* Additionally, the Louisiana Fifth Circuit found that the "probative value of the photographs w[as] not outweighed by their prejudicial effect against the defendant." *Id.*

The R&R recommends dismissal of these claims because they are not cognizable on federal habeas review as they are solely evidentiary rulings based on state law; no clearly established federal law created rights that the rulings impinged upon; the rulings were not so material as to implicate a defendant's constitutional right to present a defense or to a fair trial; and Jacobs failed to present clear and convincing evidence that the Louisiana Fifth Circuit's findings of fact on any of these rulings were unreasonable.[187] Jacobs' single-sentence objection to the R&R's recommendations on these claims is that they are "not raised as merely state law evidentiary issues."[188] Nevertheless, as noted by Magistrate Judge Currault, "'fleeting references' to the United States Constitution or the phrase 'due process' are not sufficient to change the nature of a state law evidentiary claim into a cognizable federal

---

[187]   R. Doc. 43 at 100-17.
[188]   R. Doc. 48 at 44.

issue."[189]  Even if Jacobs were correct that these claims were cognizable on federal habeas review, he has not briefed any specific objections to the R&R's analysis of the Constitutional ramifications of the state court evidentiary rulings, pointed to any federal law that might "clearly establish" Constitutional rights violated by the trial courts' rulings, or presented any evidence to suggest that the state courts' factual findings were clearly erroneous on these issues, as is his burden under the AEDPA.  Jacobs' argument that his claims related to federal Constitutional rights and not state evidence law was before Magistrate Judge Currault.  He presents no new evidence or argument in his objections.  Accordingly, the Court overrules Jacobs' objection on these claims for the reasons stated in the R&R.  *See Foster v. Shalala*, 21 F.3d 1107 (5th Cir. 1994) (per curiam) ("It was unnecessary for the district court to restate the magistrate judge's finding[s]" when the record clearly refuted the argument.); *see also Thomas v. Arn*, 474 U.S. 140, 147 (1985) (noting that objections "enable[] the district judge to focus attention on those issues—factual and legal—that are at the heart of the

---

[189]   R. Doc. 43 at 100 (citing *Norris v. Davis*, 826 F.3d 821, 831 (5th Cir. 2016)).

parties' dispute," and that a district court should not be required "to review every issue in every case, no matter how thorough the magistrate's analysis").

### H.    Remaining Claims

While, in his objections to the R&R, Jacobs repeatedly asserts that he "maintains his objections to all aspects of the Report related to all claims in his petition,"[190] Jacobs did not brief any objections to the R&R's recommendations with respect to his insufficiency of the evidence claim, his standalone ineffective assistance of counsel claim based on his counsel's alleged concession of certain elements of the offense during the trial, or his jury instructions claim.

Under Federal Rule of Civil Procedure 72 "[w]ithin 14 days after being served with a copy of" an R&R, "a party may serve and file *specific* written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(1) (emphasis added). The Court must "determine de novo any part of the magistrate judge's disposition that has been *properly* objected to." Fed. R. Civ. P. 72(b)(2) (emphasis added). "Frivolous, conclusive or general objections need not be considered by the district court." *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982) (en banc), *overruled on*

---

[190]    R. Doc. 48 at 3.

*other grounds by Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).  When a party offers only conclusory arguments, and fails to specifically object to the recommendations in an R&R, the district court may properly consider those recommendations in an R&R under plain error review.  *See Mosley v. Quarterman*, 306 F. App'x 40, 42 n.2 (5th Cir. 2008).

Accordingly, the Court reviews the R&R's recommendations on the insufficiency of the evidence, ineffective assistance of counsel based on concession of the elements, and jury instructions claims for plain error, and finds none.  Jacobs' objections to the R&R's recommendations on these claims are overruled.

## IV.   CERTIFICATE OF APPEALABILITY

Lastly, Rule 11 of the Rules Governing Section 2254 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rules Governing Section 2254 Proceedings, Rule 11(a).  A court may issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional

right."  28 U.S.C. § 2253(c)(2); Rules Governing Section 2254 Proceedings, Rule 11(a) (noting that § 2253(c)(2) supplies the controlling standard).  The "controlling standard" for a certificate of appealability requires the petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented [are] 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. MacDaniel*, 529 U.S. 473, 475 (2000)).  For the reasons stated in this Court's Order and in Magistrate Judge Currault's R&R, the Court finds that Jacobs' petition fails to satisfy this standard.  Thus, the Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons stated in the R&R, petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, IT IS ORDERED that the petition is DISMISSED WITH PREJUDICE.  The Court will not issue a certificate of appealability.

New Orleans, Louisiana, this __30th__ day of May, 2024.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE